1-1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

UNITED STATES OF AMERICA        )        MO-14-CR-93
                                )
                                )
VS.                             )        **Jury Trial Vol. 1**
                                )
                                )
ERIC WARNER CAWTHON             )        July 14, 2014


**BEFORE THE HONORABLE ROBERT JUNELL**
**UNITED STATES DISTRICT JUDGE**
**In Midland, Texas**


**FOR THE GOVERNMENT:**          **MR. JOHN S. KLASSEN**
                                 **MR. AUSTIN BERRY**
                                 Assistant United States Attorneys
                                 400 W. Illinois, Suite 1200
                                 Midland, Texas  79701
                                 (432) 686-4110


**FOR THE DEFENDANT:**           **MR. DAVID G. ROGERS**
                                 Fivecoat & Rogers
                                 214 W. Texas Avenue, Suite 811
                                 Midland, Texas  79701
                                 (432) 620-8774


**COURT REPORTER:**              **MR. TODD ANDERSON, RMR, CRR**
                                 United States Court Reporter
                                 1100 Commerce, Rm. 1625
                                 Dallas, Texas  75242
                                 (432) 686-0605


        The above-styled and numbered cause was reported by
mechanical stenography and produced by computer.

1-2

INDEX

Jury selected.......................................... 5

Jury sworn............................................. 6

Preliminary instructions............................... 8

Rule invoked.......................................... 16

Witnesses sworn....................................... 16

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESS FOR THE GOVERNMENT | | | | | |
| KRISTOPHER KNIGHT | 17 | 75 | 80 | | |

Government rests.................................... 81,84

MOTION:  Mr. Rogers.................................. 81

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE DEFENDANT | | | | | |
| ERIC CAWTHON | 85 | 96 | 107 | 108 | |
| KRISTOPHER KNIGHT (Jury out) | 113 | | | | |

Defendant rests..................................... 110

Government closes................................... 110

Defendant closes.................................... 110

MOTION:  Mr. Rogers................................. 111

Todd Anderson, RMR, CRR    (432) 686-0605

1-3

| GOVERNMENT'S EXHIBITS: | | Marked | Received |
|---|---|---|---|
| 1 | Craigslist advertisement | 4 | 43 |
| 2 | Gmail conversation | 4 | 43 |
| 3 | Pictures exchanged via Gmail | 4 | 43 |
| 4 | Text messages | 4 | 43 |
| 5 | Recorded phone call | 4 | 43 |
| 6 | Video interview - 12:10-23:28 | 4 | 43 |
| 7 | Photos of $10 bill | 4 | 43 |

1-4

(July 14, 2014)

(Defendant present)

(Government's Exhibit Nos. 1-7 marked)

THE COURT:  It's 11:32.  We are outside the presence of the jury panel.  The attorneys are present.  Mr. Cawthon is present.

The attorneys have been given a copy of the proposed jury in this case after all strikes for cause, excuses, and peremptory strikes have been taken.

Mr. Berry, is the Government satisfied?

MR. BERRY:  Yes, Your Honor.

THE COURT:  And, Mr. Rogers, is the Defendant satisfied?

MR. ROGERS:  Yes, Your Honor.

THE COURT:  All right.  Let's bring the jury panel in, and let's all rise for them, please.

(Jury panel in)

THE COURT:  All right.  Let's all be seated.

It's 11:35, and we've got the jury panel back in here with us with the attorneys and Mr. Cawthon.

Ladies and gentlemen, as you hear your name called, if you would come over here, and then the Courtroom Security Officer will show you where your seat is in the jury box for those of you selected for jury in this case.

Mrs. LaForge, would you read the name of those

jurors, please?

THE CLERK:  Michael Hobbs.

James Huckaby.

Diana Jones.

James Rasor.

Rita Bledsoe.

Jimmy Springer.

Anna Kendall.

Crystal Alderete.

Gary Neusch.

THE COURT:  Neusch.

THE CLERK:  Neusch?  It's different.  Excuse me.

THE COURT:  It's Neusch.

JUROR NEUSCH:  Just don't call me late for dinner.

Katy Clark.

THE COURT:  And that's not Kathy.  It's Katy, I found out, pretty sure.  I called her Kathy.

THE CLERK:  Stephen Lyle.

John Anderson.

Our first alternate, Lisa Vander-Zanden.

And our second alternate, Paul Whitaker.

THE COURT:  Mr. Berry, is the Government satisfied?

MR. BERRY:  It is, Your Honor.

THE COURT:  And, Mr. Rogers, is the Defendant

satisfied?

MR. ROGERS:  Yes, Your Honor.

THE COURT:  Ladies and gentlemen of the jury panel, thank you so much for being here this morning. Again, our system of justice would not work if it wasn't for our jurors and citizens participating.

You're now excused.  We're going to remain seated, but y'all now -- y'all are now excused.  Thank you very much.

(Jury panel excused)

THE COURT:  All right.  Let's all rise now.

And could we have the cry of the Court, please?

(Cry pronounced)

THE COURT:  Would you please raise your right hand while Mrs. LaForge swears you as jurors in this case?

(The jury was sworn)

THE COURT:  Okay.  Please be seated.

What I'm going to do is -- let's recess for lunch, and then I will have you come back.  Let's be back at 1:15. That gives everybody plenty of time to catch a bite around downtown.  And it's so hard to maneuver downtown Midland right now, but our parking lot across the street is there for you.

I would ask you not to discuss the case with anybody.  Don't let anybody discuss it with you.  Don't do

any research about the case.  And we'll talk about some more of these instructions when you come back.

You've got some notebooks.  Why don't you -- since you haven't started writing in them, just leave them here in the jury room [sic].

And be back here ready to go at 1:15, if that would be all right with everybody, and then we'll get started.  And we're right on time to finish this case tomorrow, so everything is going well.  So with that, we will see you back here at 1:15, then.  Thank you.

Let's all rise for the jury.

(Jury out)

THE COURT:  Anything else of a pretrial nature that we need to take up, Mr. Berry, that we need to take up at this time?

MR. BERRY:  No, Your Honor.

THE COURT:  Mr. Rogers?

MR. ROGERS:  No, Your Honor.

THE COURT:  All right.  Gentlemen, if y'all would be back here ready to go.

Marshals, if we could have the Defendant up here at 1:15, and we'll get -- I'll do instructions and let the parties make their opening statements at that time.

So we'll be in recess till 1:15.  Thank you.

(Recess from 11:40 to 1:19)

1-8

THE COURT: All right, sir. Let's all be seated.

It's 1:19, and we're back in the courtroom with the jury. The attorneys are present. Mr. Cawthon is present.

Ladies and gentlemen, as you recall before lunch, Mrs. LaForge gave you the oath as jurors. And you've now been sworn as the jury to try this case, and you and you alone are the judges of the facts. And by your verdict you will decide the disputed issues of fact.

I will decide all questions of law that arise during the trial. And before you retire to deliberate at the close of the case, I will instruct you on the rules of law that you must follow and apply in deciding upon your verdict.

Nothing that I may say or do during the course of the trial is intended to indicate nor should be taken by you as indicating what your verdict should be. Your verdict should be based upon your independent assessment of the facts in this case as applied to the law on which I will instruct you at the conclusion of the case.

The evidence from which you will find the facts will consist of the sworn testimony of witnesses who take the stand, documents, and other things received into the record as exhibits, and any facts the lawyers agree or stipulate to or that I may instruct you to find.

Certain things are not evidence and must not be considered by you as evidence, and I will list those for you now.  Statements, arguments, and questions by lawyers are not evidence.  Objections to questions by lawyers are not evidence.

Lawyers have an obligation to their client to make an objection when they believe evidence being offered is improper under the Rules of Evidence.  You should not be influenced by their objection or by my ruling on it.

If I sustain the objection, ignore the question.  If I overrule the objection, treat the answer like any other.  If you're instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that I exclude or tell you to disregard is not evidence and must not be considered.  And anything you may have seen or heard outside the courtroom is not evidence and must be disregarded.  You're to decide this case solely on the evidence presented here in the courtroom.

There are two kinds of evidence:  direct evidence and circumstantial evidence.  Direct evidence is direct proof of a fact, such as testimony of an eyewitness.  Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist.

Let me give you an example.

1-10

Let's say instead of it being Monday, it's tomorrow, Tuesday, July 15th.  And a case, not this case, but a case is being tried, and a witness takes the stand, and they said, "On Monday, July 14th, it was not Sunday and it was not a federal holiday.  I got up to go to work," and the witness says that he checked his mailbox before he left to go to work.  He went to work.  There wasn't anything in his mailbox.  He came home about 5:00 in the evening.  There was a white van on his street with a red and blue stripe around it.  The steering wheel was on the right-hand side rather than the left-hand side.  A gentleman in a blue uniform got out of the van and took some papers and put it into the witness's mailbox.  The witness went over and opened his mailbox, and, sure enough, there was properly postmarked, addressed mail.

That witness is an eyewitness to the mailman delivering the mail.

So let's say the witness didn't testify to that but he testified to this.  Again, the case is on Tuesday.  And so on Tuesday, he said, "On Monday, July 14th, I got up to go to work.  I checked my mailbox before I left to go to work.  There wasn't any mail in my mailbox.  I went to work.  I came home at 5:00.  I didn't see a white van on my street.  I didn't see a man in a blue uniform.  I didn't see anybody put anything in my mailbox, but I came and opened my

1-11

mailbox, and there was properly postmarked, addressed mail in my mailbox."

That's circumstantial evidence that the mailman delivered the mail.

So you can consider both types of evidence, both direct and circumstantial evidence. And I will give you some further instructions on these as well as other matters at the end of the case.

It's up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. And, again, I will give you some guidelines for determining the credibility, the believability of witnesses at the end of the case.

You should give careful attention to the testimony and evidence presented for your consideration during the trial, but you should not form or express any opinion about the case one way or the other until you have heard all of the evidence and have had the benefit of the closing arguments of the lawyers and my instructions on the law.

Although exhibits which I admit into evidence during the course of the trial will be available to you for your inspection and review while you deliberate on a verdict, under normal circumstances no written transcript of the testimony of witnesses can be made available to you for your review while you deliberate, nor under normal

1-12

circumstances can all or any significant portion of a witness's testimony be read to you once you commence your deliberations.

So what does that mean?  Sometimes juries may go back and they begin to deliberate on a verdict, and they will go through the list of witnesses.  And one of the jurors will say, "You know, that Mr. Smith, he testified to this."

Another juror will say, "No, Mr. Smith didn't testify to that.  He testified to this."

And they will argue about it for a while.  And then a third juror will have a really good idea.  They said, "You know, I watched Law & Order last night, and that same situation came up on Law & Order, and that judge just brought the jury back into the courtroom and had the court reporter read what a witness had to say.  Judge Junell looks like he's about half as smart as that judge on Law & Order, so we'll get him to do that."

Well, that happens on Law & Order and Boston Legal and all those legal type shows.  It is very, very, very unusual for that to happen in a real trial, so don't count on it.

You've been provided notepads.  You are free to take notes or not take notes.  If notes will assist you in keeping up with witnesses or exhibits or, you know, things

1-13

that go on, feel free to take notes.

When you go back to deliberate, a witness who -- I mean -- a witness -- a juror who does not take notes should not let a juror who did take notes -- don't let them overly influence you, in other words.  And if your notes are different than your memory, let your memory take precedence. Your notes are not exhibits, in other words.

During the trial you must not discuss the case in any manner among yourselves or with anyone else.  You must not permit anyone to attempt to discuss it with you or in your presence.

Now, the lawyers that you see here in the courtroom and other people that are associated with the case, you're instructed to not have any conversation with them, not even polite conversation.

You know, we're the most polite people on the face of the earth here in West Texas.  We have conversations with complete strangers about, "Is it going to rain again?  You know, how about the World Cup?" or whatever it is you want to discuss.  And you may get in the elevator with them at the same time or come into the courthouse at the same time.

They've been instructed by me, as well as the people associated with both sides of the case, to have no conversation with you whatsoever, not even polite conversation.  And the reason for this is we don't even want

1-14

to have the appearance of impropriety now that the case has begun, so I would ask you not to have any conversation with them.

If something comes up and you need to get word to me, these handsome young -- well, these young men -- well, these guys with the blue blazers over here right there, if you will just let them know, they'll get the information to me if something comes up and you need to let me know about it.

I would also ask you to avoid any independent investigation now that the case has started.  Avoid reading any newspaper articles or listening to any news on TV or radio that might mention this case.  And the reason for this is, again, you've taken an oath to decide this case based solely on the evidence here in the courtroom and my instructions on the law.

I would also ask you not to get on the Internet and try to do any research.  Don't Google anything up or Facebook anything up or whatever y'all people do and look up things.  Again, you have taken an oath to decide the case on the evidence here in the courtroom.

From time to time during the trial, I may be called upon to make rulings of law on motions or objections made by the lawyers.  Again, do not infer or conclude from any ruling I make that I have any opinion on the merits of

1-15

the case favoring one side or the other.

If I sustain an objection to a question that goes unanswered by the witness, do not speculate on what answer might have been given nor draw any inference or conclusion from the question itself.

During the trial it may be necessary for me to confer with the lawyers from time to time out of your hearing concerning questions of law or procedure that require consideration by me alone.  On some occasions you may be excused from the courtroom as a convenience to you and to us while I discuss these matters with the lawyers, and I will try to limit these interruptions as much as possible.

The trial will now begin.  The lawyers for each side will be given an opportunity to make an opening statement in which they may explain the issues in the case and summarize the facts they expect the evidence will show.

First, the Government will make an opening statement, which, again, is simply an outline to help you understand the evidence the Government's attorney expects to introduce.  Next, the Defendant's attorney may elect to make an opening statement.  The Government will then present its witnesses, and the attorney for the Defendant may cross-examine them.

Following the Government's case, the Defendant

1-16

may, if he elects, present witnesses, and the Government will have an opportunity to cross-examine them.

Subsequently, the Government may decide to present rebuttal witnesses.

After all the testimony and evidence has been given, the lawyers will be given another opportunity to address you and make their final arguments in the case.

The statements that the lawyers make now, as well as the arguments that they present at the end of the trial, are not to be considered by you either as evidence in the case, which comes only from the witnesses and exhibits, or as your instructions on the law, which come only from me. Nevertheless, these statements and arguments are intended to help you understand the issues and the evidence as it comes in, as well as the positions taken by both sides.

Mr. Rogers, do you invoke the rule in this case?

MR. ROGERS:  I do, Your Honor.

THE COURT:  Okay.  If I could have your witnesses, Mr. Berry.

MR. BERRY:  Yes, Your Honor.

THE COURT:  Come right up here.  And if you would raise your right hand, please.

(The witnesses were sworn)

THE COURT:  Okay.  You can put your hands down.

The rule has been invoked.  And what that means,

with the exception of the case agent, you need to remain outside the courtroom. You may not discuss the case or your testimony with anyone except the attorneys until the jury begins its deliberations. Does everybody understand?

WITNESSES: Yes, sir.

THE COURT: Okay. You're excused outside the courtroom.

You can be seated.

Mr. Berry, you're recognized to make an opening statement on behalf of the Government.

MR. BERRY: Thank you, Your Honor.

(Opening statements were requested but were not transcribed pursuant to Court Order)

THE COURT: Mr. Berry, would you call your first witness, please?

MR. BERRY: Yes, Your Honor. The United States calls Kris Knight.

(Pause)

THE COURT: Mr. Berry, you may proceed.

MR. BERRY: Thank you, Your Honor.

KRISTOPHER KNIGHT, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BERRY:

Q. Agent Knight, would you please tell the jury how long you've been involved in law enforcement?

A.    I've been a federal agent for a little over six years now.

Q.    And where did you start your career in law enforcement?

A.    In Truth or Consequences, New Mexico, as a Border Patrol agent.

Q.    That's where I was headed.  With Border Patrol; is that correct?

A.    Yes, sir.

Q.    And now you work for whom?

A.    Homeland Security Investigations.

Q.    And Homeland Security Investigations is part of what federal department?

A.    It's under the Department of Homeland Security.

Q.    And what do agents with the Homeland Security Investigations typically do on a day-to-day basis, agents like yourself?

A.    Our job is to enforce transnational crimes, customs and immigration work.  So a lot of the work we do is money laundering, drug related, child pornography, immigration violations, major immigration violations such as marriage fraud, stuff like that.

Q.    And were you part of a Task Force on March 27, 2014, that's the subject of today's trial?

A.    Yes, sir.

Q.    Explain to the ladies and gentlemen of the jury a

Knight - Direct

1-19

little bit about this Task Force, what it was comprised of that, sort of thing.

A.    Yes, sir.  The Task Force was comprised of Homeland Security Investigations agents, FBI agents, Department of Public Safety troopers and agents, and I believe there was Midland Police Department officers also present.

We set up the operation in order to identify adults in the Midland and Odessa area that have a sexual interest in children.  We did this in order to be proactive in cases like this, because oftentimes we handle cases where children meet adults online and they are victimized and we have to react after the child has already been victimized. And so we set this up in order to identify these people and hopefully catch them before they're able to victimize children.

Q.    And you said that sometimes you've been involved with cases where there was a child that has already been victimized.  We call that a reactive case; is that right?

A.    Yes, sir.

Q.    And have you been involved, personally been involved in investigations or yourself or aiding other agents in investigations where children in the Midland-Odessa area, teenagers, have been involved in this kind of activity?

A.    Yes, sir.

Q.    And is it a priority of your office to investigate that

type of crime?

A.    It's an absolute priority, yes, sir.

Q.    So those reactive cases, real children, real adults, communicating in what form?

A.    Through many different types of media, telephones. They will Skype.  They will text.  They will e-mail.  They use all different types of electronic devices.

Q.    And different applications on smartphones like KIK and other things?

A.    Yes, sir.

Q.    And so having had that experience and knowing that that occurs, what was the goal with creating this what you call proactive investigation?  Explain that again.

A.    It's -- it's a way to identify adults before they are able to victimize.  If we can identify them and we can make the arrest, then they don't get the chance to victimize children.

Q.    So what was the plan with this operation?  How was it organized and constructed?

A.    There was a multi-agency effort.  We got together at the DPS office, the Department of Public Safety office, and we had undercover computers, and we posted ads onto Craigslist.

And then there were people -- different people had different jobs.  My job was to act as a person who would

1-21

chat online.  So we would set up an advertisement on Craigslist, wait for people to respond to that advertisement.  And then once they did, we would tell them our age and continue the conversation from there; or as the cases in most of the conversations we had, once people found out how old we were, they stopped talking to us altogether because they didn't have a sexual interest in children.

So the ones who continued to speak with us after they found out that we were minors, those are the ones we continued to talk to and attempted to meet.

Q.   And when you say the people who refused to talk to you after they knew your age, would you say that that's the vast majority of the people that responded?

A.   Yes, sir.  The vast majority would either stop talking to us altogether or they would tell us that they were going to call the police.  And, in fact, we've had the police called on us for posting advertisements where they thought it was a minor and they were actually trying to do the right thing.

Q.   And how quickly into the conversation do you tell the other person you're talking to, in this case Mr. Cawthon, the age of the child you're appearing to be?

A.   We attempt to tell them relatively soon in the conversation.  We don't want to waste our time talking to someone who has no interest in children.  At the same time

Todd Anderson, RMR, CRR    (432) 686-0605

Knight - Direct

1-22

you can't -- to make it realistic, you can't -- when they respond and say, "hi," you can't immediately say, "I'm 14." You have to make it natural, but we do that in the first few messages.

Q.   And talk for a minute -- explain to the jury -- we asked the question during voir dire about those that were familiar with Craigslist.  But briefly explain what Craigslist is to those who may not have been familiar with it.

A.   Okay.  Craigslist is an online posting forum.  It's similar to the newspaper, classified ads in the newspaper. You can go on there, list a classified ad for anything.  You can put cars for sale.  You can do apartments for rent, houses for sale or rent.  And there's a personals section where you can post in the "Women Looking for Men, Men Looking for Women," trying to find dates, stuff like that.

Q.   And is the classifieds, this Craigslist, is it -- you said it's like a classifieds in the newspaper.  Is it also like the Thrifty Nickel for those that may be more familiar with that locally?

A.   Yes, sir.  It's a similar -- it's an online format of a Thrifty Nickel.

Q.   Free to post the ad?

A.   Yes, sir.

Q.   In the "Personals Section," is that where you posted

this advertisement of who we were calling Ashley?

A.    Yes, sir.

Q.    And how old was Ashley in this operation?

A.    14.

Q.    And is that what you told the people, including Mr. Cawthon that you were talking to?

A.    Yes, sir.

Q.    When the operation was developed and planned, did you -- you -- when I say you, you and the other law enforcement agents, did y'all think about profiles of Ashley, so to speak?

A.    Yes, sir.  We planned -- we planned who Ashley was, because we wanted everyone to be on the same page when they were talking online.  We didn't want to have one person say she's 13, one person say she's 14, and one guy says she has brown hair, one guy says she has blond hair.  So everyone knew who Ashley was.

Q.    And, in fact, did you even go further and have photographs of who this Ashley would be?

A.    Yes, sir, we did.

Q.    And was that of a real 14-year-old girl?

A.    No, sir.

Q.    And why not?

A.    We don't want to endanger a child, so we take an adult and we can send it off to a national center and have them

1-24

age regressed a little to make her look younger.

Q.   Let's pause there for a second.  This adult, was this a person that we know, or did you just take a picture of some random adult off the Internet?

A.   This was a law enforcement officer who volunteered to let us use their likeness.

Q.   A law enforcement -- a female law enforcement officer?

A.   Yes, sir.

Q.   That appeared young anyways?

A.   Yes, sir.

Q.   And she agreed to have her photograph utilized in this manner?

A.   Yes, sir.

Q.   And you said something about a national center. Explain that to the jury.

A.   There's a National Center for Missing and Exploited Children.  They -- they're -- they act as a clearinghouse. They take all the images of child pornography and these abuse victims, and they keep a database full of the images so that if we ever come across a picture of a victimized child, they will be able to identify who the girl is in real life and try to get help to that person.

Q.   And does the National Center for Missing and Exploited Children, what I will hereafter refer to as NCMEC -- N-C-M-E-C, right?

1-25

A.   Yes, sir.

Q.   What we call NCMEC colloquial.  Does that center also -- is it also involved in helping to find children who have gone missing, hence the name?

A.   Yes, sir, it does.

They -- if a child is a runaway or another missing child, you can -- the parents or the police can send the picture to them, and they can -- they can help try to identify to see if it was one of the children that have been abused, or they can send the picture out to a wider audience to try to identify that.

Q.   And so the jury may be more familiar with their -- with what NCMEC's primary function is in terms of progressing a photo.  Explain that to the jury.

A.   Yes, sir.  They can take a photo -- if a child ran away at 12 and it's been six years since they ran away, the center can take that picture and progress the age to where the child looks -- what the child will probably look like at 18.

Q.   And so this same technology, are they able to take a person who is older and regress that photo to look younger?

A.   Yes, sir.

Q.   And is that the technology that you asked them to utilize in this case?

A.   Yes, sir, we did.

Q.   And so did you take the female adult law enforcement officer's photo and send that to them to regress it to look younger?

A.   We did.

Q.   And did you give them any -- you and the other agents give them any instructions about how young we were trying to be or anything like that?

A.   I wasn't in on if they were told how old to make the children.  I just --

Q.   Okay.  And the photos that come back, do they look to be younger from a law enforcement perspective?

A.   I think so, yes, sir.

Q.   And did you, in fact -- were you, in fact, requested by Mr. Cawthon to send out a photo in this case?

A.   I was.

Q.   And did you send out one of those photos that we were attaching to the Ashley profile?

A.   I did.

Q.   In addition to regressing the photo, what other law enforcement techniques were utilized or are utilized in the operation to make the child or make the person appear to be under the age of 18?

A.   Just the speech patterns we use in the messages.  We don't always spell things correctly.  We use shortening of words.  Either -- I don't how to describe it, but kids

1-27

sometimes won't use the full word; they will just use partial words and abbreviations.

Q.   Give us an example of texting lingo.

A.   One of them -- one of them is "hit me up," and it means to contact me.  But instead of saying that, they use the abbreviation HMU, so that -- for hit me up, and that's -- and so they abbreviate everything.

Q.   So instead of saying, "Please e-mail me at the following contact address" --

A.   Yes, sir.

Q.   -- you say --

A.   HMU.

Q.   -- "hit me up"?

A.   Yes, sir.

Q.   Okay.  And it's supposed to mean the same thing?

A.   Yes, sir.

Q.   Okay.  In addition, did you guys have the ability to record or conduct a live call with anyone who wanted to talk to the child to try to verify how young and make sure it wasn't a cop or anything?

A.   Yes, sir, we did.  We had a voice changer available to us that we could -- we could hook to our phone and have an officer talk on the phone, and it would go through the voice changer and bring the voice down to a -- to a younger age level.

Q.   And was that, in fact, done in this case?

A.   It was.

Q.   And briefly explain to the ladies and gentlemen of the jury how that process worked and what y'all did in this case.

A.   First, we had to identify which officer was going to do -- was going to speak on the phone, and we picked a female officer because it's harder to change a male voice into a female voice.

Once we identified the officer, we then -- there's a few settings on the machine that you can preset it to, and you can also manually adjust.  And so we got the officer and we made some test calls to identify which -- which voice setting sounded natural.

Q.   And natural for what?

A.   For a 14-year-old.

Q.   As opposed to?

A.   To -- the officer, I think, is early 20s.

Q.   And you weren't trying to make her sound like a four-year-old, for example?

A.   No.  We definitely did not want to stray too far young.

Q.   In this case, tell the ladies and gentlemen of the jury -- we're going to look at the exhibits, but just briefly tell them about the ad that was posted on Craigslist by law enforcement.

A.    It was very innocuous.  It just said "Home Alone."  And then I believe it did use the same -- the term we spoke about earlier, HMU, "hit me up if you're not scared" and --

Q.    Okay.  And then did you receive multiple responses to that ad?

A.    I did.  We did.

Q.    And you said in the general operation and this ad in specific, did some people -- once they responded to the ad, did they inquire of the age?

A.    Yes.

Q.    And did you tell them -- tell each of them that you were 14 or almost 15, something like that?

A.    Yes, sir.

Q.    And what percentage would you say, roughly speaking, said, "no thanks" in some form or another?

A.    Well over 90 percent.

Q.    Okay.  And in this case, how did Mr. Cawthon originally respond to that ad?

A.    He sent an e-mail responding to the advertisement and said, "If you're still looking for someone, text me at this number," and then he gave me his phone number to text.

Q.    Okay.  And from there, how did the conversation progress?  Did you continue by e-mail or what?

A.    I replied to the e-mail, saying that I sent the text message to his phone number.  And then from there all --

1-30

well, not all, but the majority of the conversation was conducted by text messages through the phones.

Q.   And approximately what time did the texting start with Mr. Cawthon on March 27th?

A.   It was in -- it was in the evening, but I don't remember the exact time, sir.  I apologize.

Q.   Okay.  And do you recall within how many texts or minutes that the age discussion began?

A.   It was -- it was in the first five to ten messages between the two of us.  It was, you know, "hello" and then "hello," and then very quickly, "How old are you?"  And --

Q.   And how many times did you tell him your age?

A.   Twice.

Q.   And how did you say it?

A.   The first time, I told him I was 14 and then replied "U," the letter "U."  His response was 30.  And then my response right after that was, "I'm almost 15.  How old are you again?"  And he said 30.

Q.   So why do that?  Why say it twice?  Why -- what did that tell you from a law enforcement perspective?

A.   That he's -- he's read the message and he understands exactly how old we are.

Q.   The -- did you then exchange e-mail addresses, direct e-mail addresses?

A.   Yes, sir.  After I told him how old I was, his

1-31

immediate response was, "Do you have a picture?"  He wanted to see a picture.

So the system we were using, we couldn't send pictures via text messages, so we had to do it by e-mail. So we exchanged e-mail addresses and then exchanged photographs.

Q.   Did -- after saying his age and he knew your age, did at any point he say, "You're a little young for me" or anything like that?

A.   No, sir.  His immediate response was he wanted a picture.

Q.   Was there any large gaps in the conversation that you had to pick back up on?

A.   Just during the phone call conversation that we had.

Q.   Explain that.

A.   During the conversation, he asked if he could -- if he could talk to us on the phone.  The reason he asked that is he wanted to make sure that it wasn't a police sting. That's what he was asking us, if we were the police.  So in order to verify that we weren't the police, he wanted to talk to us.  So we told him we could talk to him.

And we set up the -- we had the voice changer set up where we had it -- we got it lined up and made the phone call to him.

Q.   And about how long was that phone call?  Do you recall?

A.    Nine minutes.  A little over nine minutes, I believe.

Q.    Okay.  And in the course of the texting conversation, did he also -- you said he also asked for a picture, correct?

A.    He did.

Q.    And did you, in fact, send him one of these age-regressed photos that you were talking about earlier?

A.    Yes, sir.

Q.    Did he respond with a picture of his own?

A.    He did.

Q.    After the phone conversation did you guys continue to text after that?

A.    Yes, sir.

Q.    Briefly tell the ladies and gentlemen of the jury what the content of that phone conversation was.  What did the Defendant say in that phone conversation?

A.    He -- he -- we talked about what we wanted to do.  The officer on the phone said that she was too nervous to say.  She was acting young.  He told her that he would show her how to make a man feel good, that he wanted her to wear a skirt.

        And his initial -- what he initially said was, "I want you to wear a skirt with a thong."  But then he said, "No, wait.  No panties."  So he wanted her to wear a skirt with no panties when they met.

He told her that he wanted her to call him daddy and do as she's told and that he would take her back to the hotel and she would undress.  And then from there they would have to see what happened.

Q.   And he just kind of left it hanging with that?

A.   Yes, sir.

Q.   In the beginning of that phone conversation, did he say anything about fearful of being arrested?

A.   During the phone conversation, yes, he did.  He said he was afraid of being arrested, and he asked if we had seen the show To Catch a Predator.  The officer responded that she doesn't watch much TV and she usually watches Netflix.

Q.   And, again, you said that phone conversation was about nine minutes or so?

A.   I think maybe the whole recording is nine minutes and the phone call maybe was seven, eight.

Q.   So after that phone call, did you then continue to text with the Defendant?

A.   We did.  I did.

Q.   And what was the course of that conversation?  How did that go?

A.   So I apologize.  I can't remember if this was before or after the call, but there was the point where I talked about I wanted to get out and do something.  And he asked if I could drive, and I told him I can't drive.  And he said he

1-34

had a bus that he drove.  So my reaction was, "I guess we can't meet."  And then his immediate response to that was, "Can you get a ride?"

Q.   Stop right there for me for a second.  When you say, "I guess we can't meet," what's the purpose of saying that in the course of this conversation?

A.   It's to let him be in control, to let him lead the conversation and the direction of what we're -- what we're going to do.

Q.   And if he had said, "Okay.  See you later," how would -- how would you have continued?

A.   That would have been the end of the conversation.

Q.   But he didn't say that?

A.   No, sir.

Q.   What did he say?

A.   He said, "Can you get a ride?"

Q.   And then what -- how did the rest of the conversation go from there?

A.   From there I told him we could.  We attempted to plan a location where we could meet.  Because he was in Odessa and our operation was mostly in Midland, we didn't -- we didn't set up for any meet locations in Odessa, so we had to decide where we wanted to do the meet.

We suggested a place.  He didn't know -- Mr. Cawthon didn't know where that place was.  So he

suggested a different place and told us that he would pay our friend $10.00 if she would take us to the place he suggested.

Q.   And the place that he suggested, was that a truck stop of some kind?

A.   Yes, sir.

Q.   And that was not one of the prearranged locations that you guys had scouted out, correct?

A.   Correct.

Q.   Now, why was it that he needed to meet at a truck stop of all places?

A.   He was driving a bus that was for a boys' baseball team, men's baseball team.

Q.   And so he couldn't get where?

A.   He couldn't get to a residential area.  He needed to get somewhere where he could get easy access with the bus.

Q.   Big parking lot, something that could accommodate large vehicles?

A.   Yes, sir.

Q.   And so did you -- did you then go back and forth with messages, text messages, trying to coordinate and make those arrangements to actually meet up?

A.   Yes, sir.

Q.   And who was it that suggested having a friend or paying a friend $10.00 or something like that?

A.    It was Mr. Cawthon.

Q.    Explain that to the jury.  What happened in that part of the conversation?

A.    Well, I told him -- he asked if I could get a ride after I told him we couldn't meet.  I told him that I would look, and I told him that I had a friend named Dez later on in the conversation that agreed to take me to meet him.

When the initial place where I suggested, that he didn't like that place, he didn't know it, so he suggested somewhere farther into Odessa, and that's when he said he would give my friend Dez $10.00 if she took me to meet him.

Q.    And do you know -- and did the Defendant ultimately show up at the arranged location?

A.    He did.

Q.    Did he show up in this charter bus that you're talking about?

A.    Yes, sir, he did.  It was full of baseball equipment.

Q.    Just describe for the jury what this charter bus looks like.

A.    It was a -- it was a white charter bus.  I don't -- I mean, it's one of those big coaches that they use to move athletic teams.  And it had a bunch of baseball equipment inside of it.

Q.    And did he park approximately where he said he was going to?

Knight - Direct

1-37

A.    Yes, sir.  He gave us directions, told us how to get into the parking lot there and where to park.

Q.    And approximately when did he show up in relation to when the conversation started?  Do you recall?

A.    I don't recall the exact time.  I remember it being quick.  And he was -- he was very aggressive about telling us to get there soon.

When I told him it would take about 40 minutes for us to make it to the gas station from Midland because I had to have my friend come get me and get there, his response was, "ASAP.  It's only ten minutes from me."  So he was very, very aggressive about making sure that we got there quickly.

Q.    He was telling you it didn't take you 40 minutes to get there.  You should get there quicker?

A.    Right.

Q.    Okay.  And just set the scene for the ladies and gentlemen of the jury about how the -- it went there at the truck stop.  Which truck stop was this, by the way?

A.    I think it was a Pilot --

Q.    Okay.

A.    -- is the name.

Q.    On I-20 and Loop 338?

A.    Yes, sir.

Q.    Okay.

1-38

A.    It's a newer -- it's a newer gas station, newer truck stop.

Q.    And when you got there, was it difficult to identify who Mr. Cawthon was?

A.    No, sir, it was not.

Q.    Explain that to the jury.

A.    There was only one bus parked in the back parking lot where he told us to pull in.  In order to -- we had an arrest team there.  Like I said earlier, there was different people that had different jobs during the operation.  My job was to chat with people online, and there was another team set up to make arrests when it came time.

        The arrest team was set up, but in order to make sure everyone was safe and there was no danger, we wanted to get Mr. Cawthon out of the bus, so we sent the message that, you know, "I'm in a red truck."  We were in a red truck.  And, "Can you come to us so you can give Dez," the friend, "the $10.00?"  And his response was "yes."

        Then we saw him get out of the bus and walk across the parking lot to where we were.  He began walking across, and when he got about halfway is when he was arrested.

Q.    Okay.  And what did he have in his hand or his pocket, whatever it was?

A.    In his hand was $10.00.

Q.    The $10.00 he said he was going to give your friend for

giving you the ride over there?

A.    Yes, sir.

Q.    After he was arrested that evening, did you have an opportunity to interview him?

A.    I did.

Q.    And briefly explain to the jury how that process works.

A.    We -- we read him his Miranda rights.  Those are his rights, his civil rights.  He agreed to waive those Miranda rights and make a statement to us.

We questioned him about his involvement in the evening.  He told us that he knew the person he was talking to was 14 years old, or at least that's what he thought, and that he had planned to have sex with the 14-year-old girl that he was talking to on -- by text.

Q.    At any point -- or in the course of that, did he confirm that he had told this Ashley, this 14-year-old Ashley, to call him daddy?

A.    Yes.  We asked about the phone call and what he said during it, and he told us that he said he wanted -- you know, that he expressed that Ashley should call him daddy.  And there was other sexual innuendos during the phone call, was the term he used.

Q.    And did the Defendant say he had a girlfriend at the time?

A.    Yes, sir.

Knight - Direct

1-40

Q.   And did she have a daughter?

A.   Yes, sir.

Q.   And how old was that daughter?

A.   She was roughly the same age as Ashley.

Q.   Which was what age?  Do you remember?

A.   I think 13 or 14.

Q.   Okay.  So did he essentially admit to all the facts that we believe to be true up to that point as well?

A.   Yes, sir.

Q.   At any point in that interview -- and by the way, was that interview recorded?

A.   It was a video recording.

Q.   Video recorded?

A.   Yes, sir.

Q.   And was that -- at any point in that interview did he ever say, "I didn't really think she was underage," or anything like that?

A.   No, sir.  He -- I specifically asked him, and he said that he knew she was 14, that he was planning to have sex with an underage girl when he was talking to her.

Q.   And just to back up for a second, now, to post this ad on Craigslist, is there -- does Craigslist have rules, so to speak, for posting ads?

A.   Yes, sir, it does.

Q.   And what's the age that you have to be to post one of

1-41

these ads in the personals section?

A.    18.

Q.    Okay.  So explain to the jury how that works in an operation like this.  What do you have to do?

A.    There's -- there's nothing you have to do.  Craigslist just says you have to be 18 to post an ad.  That's all. When you go onto Craigslist, there's no age gate, which is a way to check and see how old you are.  It's just -- that's one of the things in their policy that says you have to be 18 to post, but they don't check.

Q.    On your honor?

A.    Yes, sir.

Q.    Okay.  In the cases that you've investigated where there have been live children actually victimized by adults, are they typically operating under similar applications and websites that have the same age requirements?

A.    Yes, sir.

Q.    And do 14-year-olds get around that age requirement?

A.    Yes, sir.

Q.    And how do they get around it?

A.    They do the exact same thing we did.  They just ignore it.

Q.    Okay.

        MR. BERRY:  May I approach the witness, Your Honor?

1-42

THE COURT:  You may.

(Pause)

BY MR. BERRY:

Q.    Agent Knight, I've handed up to you what's been previously marked as Government's Exhibits 1 through 7.  Do you see those?

A.    Yes, sir, I do.

Q.    Do you recognize them?

A.    Yes, sir, I do.

Q.    How do you recognize them?

A.    They're evidence that I put together.

Q.    Okay.  For example, is -- what is Exhibit 1?

A.    Exhibit 1 is the advertisement we posted onto Craigslist.

Q.    Exhibit 2?

A.    Is the initial conversation we had on -- by e-mail, the response to the Craigslist ad.

Q.    Exhibit 3?

A.    Was the pictures that were traded by myself and Mr. Cawthon.

Q.    Okay.  Exhibit 4?

A.    Is the text message conversation.

Q.    And Exhibit 5, is that the recorded phone call and Exhibit 6 the video interview?

A.    Yes, sir.

1-43

Q.    And Exhibit 7, what is that?

A.    That is the -- that is a picture of the $10.00 that was in the hand of Mr. Cawthon.

Q.    Okay.  Nothing unique about it, just a $10.00 bill, right?

A.    Just a $10.00 bill, yes, sir.

Q.    Just the one he had in his hand?

A.    Yes, sir.

Q.    Okay.

      MR. BERRY:  At this time, Your Honor, the United States moves for the admission of Government's Exhibits 1, 2, 3, 4, 5, 6, and 7.

      THE COURT:  Mr. Rogers, any objection to these exhibits?

      MR. ROGERS:  No objection.

      THE COURT:  Government's Exhibits 1, 2, 3, 4, 5, 6, and 7 are admitted.

      (Government's Exhibit Nos. 1-7 received)

      MR. BERRY:  Okay.

      THE COURT:  Do you want to gets the lights?  Thank you.

      (Pause)

BY MR. BERRY:

Q.    Agent Knight, we're going to look at a demonstrative that -- did you help put this demonstrative together?

1-44

A.    Yes, sir.

Q.    And it's titled "Messages Between 'Ashley' and the Defendant," dated March 27, 2014.  Explain to the ladies and gentlemen of the jury what this demonstrative exhibit encompasses.

A.    It's an exhibit that shows the conversation and the timeline as it progressed between -- between myself and Mr. Cawthon.

Q.    The first slide here, explain that to the jury.  What is that?

A.    That is the e-mail conversation that I had with Mr. Cawthon when he responded to the ad.  The picture is the one he sent us later in the conversation.  The conversation started.  I know it's one below the other, but it's actually the older you get, the lower you go on this.  So the first conversation was the bottom one.  And it says, "If you still looking for some fun hit me up text me at 806-676-7597 and tell me what your looking for."

Q.    Now, for purposes of the jury, the picture and the large white text on the blue background, that's -- we've added that, correct?

A.    Yes, sir.  We added it to make it easier to read.

Q.    Okay.  The actual exhibit is that Gmail e-mail, small text up there, correct?

A.    Correct, sir.

1-45

Q.    Okay.  And that is actually Exhibit 2, correct?

A.    Yes, sir.

Q.    Okay.  So the first thing he says is "If you're still looking for some fun, hit me up."  And that is a response to what?

A.    To the Craigslist ad we posted.  The title of the Craigslist ad is "Home Alone."  And the ad itself says, "Need some excitement, HMU," hit me up, "if you -- if your for real" -- you are for real.  "No fakers, just people that aren't scared."

Q.    And then -- so that's his response to that ad, correct?

A.    Yes, sir.

Q.    And at that moment does he know you're under age?

A.    No, sir.

Q.    Okay.  And above that, is that your response that, "I sent a text"?

A.    Yes, sir.

Q.    Explain that to the jury.

A.    I sent him a text message that says, "hi," and at the same time I sent the e-mail that says, "I sent you a text," because he wanted to move into the text conversation.  So I was letting him know that I was -- I was willing to have a text conversation with him.

Q.    All right.  So that's you saying, "I sent a text."

And this picture off to the side -- we'll look at

1-46

that in more detail later, but what is that picture of that young girl?

A. That is the picture we age regressed and we sent to him at a later time.

Q. So this is the picture he has gotten from you guys, saying, "I'm Ashley, I'm 14"?

A. Yes, sir.

Q. Okay. And now this is going to be a series of slides in the background. What is it that the jury can see back there in the small text?

A. In the background is the actual conversation we have. The white -- the white lines are Ashley or me, and the yellow lines are Mr. Cawthon.

Q. And that's the content from Exhibit 4 that the jury will have back in evidence, correct?

A. Yes, sir.

Q. The actual text messages, word-for-word verbatim --

A. Word-for-word verbatim.

Q. -- in order?

And what time was that first message in response to him where you sent him a text?

A. 9:20 p.m.

Q. Okay. So at approximately at 9:20 is when the conversation begins?

A. Yes, sir.

Q.    And you say, "hi," correct?

A.    Yes, sir.

Q.    So every time we see this picture of Ashley, that's you speaking?

A.    Yes, sir.

Q.    And then the next one is a response, and it says, "hello how are you."  And is that a picture -- the picture that the Defendant sent you?

A.    Yes, sir.

Q.    Okay.  Of Mr. Cawthon.

How does the conversation go from there?

A.    It's a pretty quick conversation as far as these operations have gone.  We get to the location fairly quickly, I think within the first -- it looks like eight to ten texts, I guess.

Q.    So it's basically, "Hi, how are you?" that sort of thing, right?

A.    Yes, sir, "Hi, how are you?  Where are you?" and then age.

Q.    And his response on where he is, is what?

A.    In Odessa at the Holiday Inn Express.

Q.    And, in fact, is that where he was staying?

A.    Yes, sir.

Q.    With the baseball team that he was chartering --

A.    Yes, sir.

Q.    -- the bus for?

You said you were in Midland?

A.    Yes, sir.

Q.    And he asked if you had a car?

A.    Yes, sir.

Q.    Is that right?

A.    Yes, sir.

Q.    Does he know your age at this point?

A.    No, sir.

Q.    Not definitively?

A.    No, sir.

Q.    And then your response is what?

A.    "No.  I can't drive" and then a frowny face.

Q.    Okay.  And what's the purpose of saying something like that, "No, I can't drive"?

As an agent, you obviously could have done an operation where you drive yourself over there, right?

A.    Right.

Q.    So what's the point of this?

A.    To help emphasize that we're young, that we're underage, that we're children.

Q.    Because if you say you're 14 and you say, "Sure.  I've got a Maserati.  I can meet you" --

A.    It doesn't make sense.

Q.    Okay.  You say you can't drive, and what does he say in

1-49

response?

A.    "Okay.  How old are you?"

Q.    And at that point, what do you say?

A.    "14.  U"?

Q.    And how does he respond?

A.    "30."

Q.    And from an investigative point, you're sitting there at the computer, what does that tell you at that moment?

A.    That he's read our message, that he knows we're 14, because he's responding to the question I had.

Q.    The "U" question?

A.    The "U."

Q.    "How old are you?" essentially?

A.    Yes, sir.

Q.    And then -- but yet you still follow up, and what do you say?

A.    "I am about to be 15 soon.  How old are you again?"

Q.    Okay.  And what does he say?

A.    "30."

Q.    And, again, what does that say?

A.    That he's read our answer and our question, and he responded to that.

Q.    So you told him twice --

A.    Yes, sir.

Q.    -- your age, 14 and almost 15, which is also 14?

1-50

A.    Yes, sir.

Q.    Okay.  And after he tells you his age and knows your age twice, what does he ask?

A.    His immediate question is, "Do you have a picture?"

Q.    So when did you tell him your age?  What time?

A.    The first time was at 9:27.

Q.    Then at 9:30, what is he asking?

A.    "Do you have a picture?"

Q.    So within three minutes he told you -- he knows your age, and he's still asking for a photo?

A.    Yes, sir.

Q.    And how do you respond?

A.    "Yeah.  Can I e-mail it?  Will you send me one?"

Q.    Okay.  And what -- and how does he go from there?

A.    "Sure" to both, "e-mail to ECawthon0313@Gmail."

Q.    Okay.  And, in fact, did you send that e-mail that we've been seeing of Ashley at about this time?

A.    Yes, sir.

Q.    All right.  And is that this new slide here at 9:34?  You sent this age-regressed photo?

A.    Yes, sir.

Q.    This is not the real female law enforcement agent that we saw, right, or that you utilized in this case?  This is a regressed version of it?

A.    This is a regressed version of the law enforcement

Todd Anderson, RMR, CRR    (432) 686-0605

1-51

agent.

Q.   And in response to that photo, what does he say?

A.   "You look very pretty."

Q.   Did you then ask him for a photo?

A.   Yes.  I said, "Thank you.  Can I have a pic from U?"

Q.   And what -- does he then -- he asks you then "e-mail or text," correct?

A.   Yes.

Q.   You asked for it in an e-mail why?

A.   Because the system we were using, we had to e-mail pictures.  We couldn't send them by text.

Q.   And this next slide here at 9:46, what is that?

A.   That's the picture he sent me.  Mine is attached, because he was responding to my -- my e-mail, so mine is still there, but the picture he sent is the one lower.

Q.   The bottom photo there?

A.   Yes, sir.

Q.   Red hat, sunglasses?

A.   Yes, sir.

Q.   All right.  Did you then ask him his name?

A.   Yes, sir.

Q.   And did he provide you a fake name?

A.   No, sir.  That's his name, Eric.

Q.   Eric.  So he's really 30, correct?

A.   Yes, sir.

1-52

Q.   He was really staying at the Holiday Inn Express, correct?

A.   Yes, sir.

Q.   And his real name is Eric?

A.   Yes, sir.

Q.   Okay.  You tell him, "You look nice," correct?

A.   Yes, sir.

Q.   He's already told you you look pretty, correct?

A.   Correct.

Q.   Then there's some more conversation, brief "Thank you. I like your beard," that sort of thing, correct?

A.   Yes, sir.

Q.   You asked him what he was doing tonight, correct?

A.   Correct.

Q.   And what was his response?

A.   "I like your smile and I am sitting in a motel room."

Q.   Again, he was staying at a motel room, right?

A.   Yes, sir.

Q.   Explain sort of how the rest of that conversation goes -- or the next little bit of that.  Just summarize it.

A.   We talked about being bored, and I told him I wanted to do something.  And that's when he asked me -- or that's when he said he doesn't have a car, he has a bus.

        And then I said, "That sucks.  I can't drive."

        When I asked him what kind of bus he drives, he

1-53

told me the charter bus.

And then that's when I said, "I guess we can't meet then."

Q.   All right.  So "I guess we can't meet then" at 10:02. You're about 42 minutes into the conversation, correct?

A.   Correct.

Q.   Now, from your perspective, from law enforcement's perspective, is this an opportunity you're giving the Defendant?

A.   Yes, sir.

Q.   What's that opportunity for the Defendant?

A.   To walk away.

Q.   Okay.

A.   To do the right thing.

Q.   And what does he do?

A.   He doesn't do the right thing.  He immediately asks if I can get a ride, because he wants to meet.

Q.   Instead of saying, "Well, you're right.  We can't meet. My mistake.  I should go away," what does he say?

A.   He says, "Can you get a ride?"

Q.   And did you anticipate this in the conversation or up to this in the operation, his asking if you could get a ride from someone else?

A.   Yes.  We had -- we had planned that, you know, we would have a ride or a way to talk them into meeting us at certain

Knight - Direct

1-54

locations.

Q.   And so he asked, "Can you get a ride?"  And before you can respond, what does he say?

A.   "Or is there a truck stop close to you?"

Q.   Meaning what?

A.   That he's willing to come to us as long as he can get his bus there.

Q.   If you lived near -- close to a truck stop, you could walk there?

A.   Uh-huh.

Q.   And he could drive there?

A.   Right.

Q.   Okay.  And so how did you respond?

A.   I told him that I could call my friend for a ride.

Q.   And he said?

A.   "Please do."

Q.   Then you asked him if you thought we could meet, correct?

A.   Yes, sir.

Q.   And he said?

A.   "Yes."

Q.   How does it go from there?

A.   I told him it was exciting, what did he want to do, trying to understand what he was going to do when we met.

         He said it doesn't matter to him.

1-55

And then I told him if I'm going to come out there, you know, I want to know what we're doing, because I don't -- I didn't want to waste my time.

And his response is, "What do you want to do?"

Q.   So you just sort of keep going back and forth?

A.   Right.  And there's a reason that he's doing this.  And I think it's apparent on the next page.

Q.   Okay.  But the very last thing you say is, "I'm nervous to say"?

A.   Yes, sir.

Q.   And his response to that is what?

A.   "Me to."

Q.   You said you wanted to meet a man?

A.   Yes, sir.

Q.   And he says, "Okay.  And what else?"

A.   Yes, sir.

Q.   He's trying to pull information from you?

A.   Correct.

Q.   And what do -- what do you try to do at that point?

A.   I tried to get him to take control again, because he's -- he's putting it off or putting -- trying to make it -- in the next message you'll see the reason he's doing this is he wants to make sure we're not police.  And so he's trying to get us to say something dirty or anything like that so that he knows that we're not the police.

Q.    And is there sort of guidelines or rules that you guys work by on these kind of operations to -- you don't just come right out and say, "I'm 14.  I want to have sex with you"?

A.    Correct.

Q.    Okay.  Explain that to the jury.  Why don't you do that?

A.    We -- because we want to find the people who have sexual interest in children.  And if we're the ones out there putting ourselves out there and saying these things, then we're not actually doing our job.  We're not finding people with a sexual interest in children.

Q.    So is the point to try to see if they're going to say anything first?

A.    Yeah, to see if they have like a predetermined --

Q.    Okay.  And what does he say?

A.    He says, "How do I know that you're not -- that you are real and not one of those stings that cops put on?"

Q.    Okay.  How did you respond?

A.    "Are you real?  I sent you my pic."

Q.    He says?

A.    "I am real can you call me."

Q.    Okay.  So right after saying he wants some confirmation that you're real, he's asking for this phone call, right?

A.    Correct.

1-57

Q.   Is that something that you have experienced in these operations, that they want some sort of proof of life, so to speak?

A.   Yes, sir.

Q.   And you say in response to the phone call question?

A.   "Yes.  Do you want me 2?"

Q.   "Do you want me to call you?"

A.   Yes.

Q.   Okay.  And what does he say?

A.   "Yes in like 5 minutes" -- "5 min."

Q.   Okay.  And so that was at what time?

A.   10:37?  No.

Q.   10:17?

A.   10:17.  Sorry.

Q.   Is it on your screen there?

A.   Yes, sir.  Sorry.

Q.   So 10:17, he says, "Call you in about -- call me in about five minutes"?

A.   Yes, sir.

Q.   And then there's a gap until 10:39, correct?

A.   Correct.

Q.   The next message is from Ashley at that point at 10:39?

A.   Yes, sir.

Q.   So tell the ladies and gentlemen of the jury what happens between 10:17 and 10:39.

1-58

A.    We -- we got the voice changer.  We got it set up and ready to go with the agent we were using, and then we made the phone call to -- to the Defendant.

Q.    Okay.  And that is what is in Government's Exhibit 5; is that right?

A.    Yes, sir.

Q.    And that's what we're going to play now.

Now, at the beginning of this, is it immediately the Defendant and the law enforcement -- the trooper, Ms. Reynosa?  Is that them talking, or do we hear some conversation in the beginning among agents?

A.    You hear conversation between agents.  We have to do a preamble before we make the call to let -- let the recording know who's in the room, who's witnessing the phone call, things like that, and just to make sure our story is good so that when the undercover officer makes the phone call that they have their story straight.

Q.    And so who all was in the room at this moment when the call was made?

A.    It was myself and Special Agent Pirtle with the FBI and DPS Trooper Reynosa.

Q.    Okay.  And do we hear Special Agent Pirtle's voice on this recording in the beginning --

A.    Yes, sir.

Q.    -- giving the preamble, as you say?

A.    Yes, sir.

Q.    Okay.  Let's listen.

THE COURT:  Let me ask one question real quick. Can the -- who the phone call is going to, the Defendant on the other end, can he hear this conversation that's going -- this other conversation that's going on?

BY MR. BERRY:

Q.    The preamble part of it where Special Agent Pirtle says, "This is March 27, 2014," dah, dah, dah, dah, dah, who's hearing that at that moment?

A.    It's just myself, Agent Pirtle, and Trooper Reynosa.

Q.    So the call hasn't even started at that moment?

A.    No, sir.  About a minute in, I think it is, you will hear the phone ring, and that's when -- that's when the phone call is made, is when you hear the phone ringing.

Q.    But it's one continuous recording?

A.    Yes, sir.

Q.    Okay.  And what's the purpose of doing that preamble again?

A.    It's -- it's to -- it's for evidence purposes, to let everyone know who -- who listened in on the conversation so who's the witness to the phone call.

Q.    Gotcha.

MR. BERRY:  May I play, Your Honor?

THE COURT:  You may.

1-60

(Audio played)

BY MR. BERRY:

Q.   Is that the end of the call, Agent Knight?

A.   Yes, sir.

Q.   So now having played the entire call, Agent Knight, again, you were in the room when that call was made?

A.   Yes, sir.

Q.   And did we hear the Defendant say that he wanted Ashley to wear a skirt initially?

A.   Yes, sir.

Q.   And then said a thong, but then changed his mind and said, "No.  No panties," correct?

A.   Correct.

Q.   And then he also asked her to call him daddy; is that right?

A.   Correct.

Q.   And at the very beginning of the call, before any of that kind of conversation began, did the Defendant say, "I just don't want to get arrested"?

A.   Yes.

Q.   So after this call, do then we go back to the text messaging again?

A.   Yes, sir, we do.

Q.   Were there any other phone calls done between the two of you?

A.    No, sir.

Q.    Okay.  So the next instance, we pick back up at 10:39, correct?

A.    Correct.

Q.    So this is now after that phone call we've just heard, correct?

A.    Yes, sir.

Q.    And you ask him if he knows Odessa?

A.    Yes, sir.

Q.    You mean how to get around or what?

A.    Yes, sir.  We were trying to plan where we wanted to meet.

Q.    Okay.

A.    For our officers' safety, we wanted to be able to control the location.

Q.    And his response is that he sort of kind of knows it?

A.    Yes, sir.

Q.    Then you ask him what?

A.    "Can you meet at the airport truck stip?"

Q.    Truck stop?

A.    Yes, sir.

Q.    Okay.  Intentional misspelling --

A.    Yes, sir.

Q.    -- or are you just really that bad a speller?

A.    No.  It was intentional.

Q.   Okay.  And, again, what's the purpose of trying to do that from time to time?

A.   To make it seem that we're younger, that we're not, you know, good at spelling or other -- or just too fast, not paying attention, just don't care.

Q.   And is that consistent with what you have seen in investigations involving teenagers doing this type of activity?

A.   Yes, sir.

Q.   He then asked for the address; is that right?

A.   Yes, sir.

Q.   And how -- sort of summarize the next little bit.

A.   Just asked him if he could Google it to find -- or I told him I would try to Google it to find it.  And then he asked the name.  The place is called Warfield.

Q.   Is that Warfield Truck Stop?

A.   Yes, sir.

Q.   Between Midland and Odessa?

A.   Yes, sir.

Q.   And you say, "My friend's mom used to work there. That's why I know it."  Explain that to the jury.

A.   I thought it was -- this -- so Warfield is a place that as a group we decided to go.  I thought it might be a little strange that a 14-year-old would know Warfield.  She would just know it as the truck stop out at the airport.  So that

was me attempting to be -- you know, at least seem like why a 14-year-old would know the name of Warfield.

Q.    You're not saying "Show up at the northeast corner of Warfield Truck Stop at 300 hours," right?

A.    Right.  That would be unusual for a 14-year-old.

Q.    And his response is, "Okay."

A.    Yes, sir.

Q.    And then you say, "Should I tell her to take me?"  And, again, who are you referring to there?

A.    The friend that he requested we find, give us a ride.

Q.    Or at the end he was going to pay --

A.    $10.00 to.

Q.    He says he'll find it, correct?

A.    Yes.

Q.    And then you start discussing timing, correct?

A.    Correct.

Q.    He asked you how far it was from you?

A.    Correct.

Q.    And you said?

A.    "It will take me 30 minutes to get there," which is the Warfield.

Q.    And what does he say?

A.    And then he says, "If I give your friend $10.00" -- or "10, would they take you to the Pilot in Odessa?"

Q.    Okay.  So what's he doing at this point?

1-64

A.    He's trying to entice me to go where I didn't choose, where he chose and farther into Odessa, farther away from where I'm from.

Q.    So he's changed the location.  He doesn't want to go to Warfield now?

A.    Right.

Q.    He wants to go to Pilot?

A.    Right.

Q.    And he's now willing to give your friend some money to take you that little bit further?

A.    Correct.  He's willing to provide money to entice a 14-year-old.

Q.    Okay.  And you say, "Which one?" correct?

A.    Yes, sir.

Q.    And he says?

A.    "I-20 and the Loop."

Q.    You clarify --

A.    Yes, sir.

Q.    -- that it's 338 --

A.    338.

Q.    -- in Odessa?

      And then summarize the next little bit.

A.    We wanted to make sure we were on the same page with him about which truck stop he was referring to, so we wanted to make sure it was the new one.

He says, "Yes, it is."

And then I told him I would ask Dez, the friend.

He says, "Okay."

And then, "My friend Dez says she would take me. When do you want to meet?"

And then he says, "Okay meet you there."

And I told him, "It will take me, like, 40" -- "40 minutes to get there, okay?"

Q.   And immediately, the same minute, 10:56, he says what?

A.   "ASAP.  It's like ten for me" -- "ten minutes for me."

Q.   So he's basically telling you what?

A.   He's telling me to hurry, to get there quickly.

Q.   It's not going to take you 40 minutes to get there?

A.   Right.

Q.   And then he says, "That will work," correct?

A.   Yes.

Q.   So then you say what?

A.   "K Dez just came by.  She has a red truck."  So that when we go, he'll be able to identify the truck we're in, so we -- we made him feel comfortable.

Q.   And just explain to the jury -- we're going to go through the rest of these messages.  But what's really the point of the rest of these messages at this moment in your investigation when you're sitting there that evening at 11:00 p.m. at night?  What's going on in the investigation?

Knight - Direct

1-66

A.    At this point, he's already crossed the line.  He's already -- he's already done the sexual talk.  He's already -- he's already made that step.  He's crossed that line to where he's willing to, you know, have sex with a minor.

So at this point, from this point forward, it's not about pursuing that crime anymore.  It's more about identifying him and arresting him, is really what we're trying to do from then on.

Q.    Because what do you know about him at this point?  You know his name is Eric?

A.    He drives a charter bus and he's at the Holiday Inn Express.

Q.    And he's 30 years old?

A.    30 years old.

Q.    Did you know his last name for sure at that moment?

A.    No, sir.

Q.    It happens to be in his e-mail, but did you know that that was his last name?

A.    No.  He could have used any name on that e-mail.

Q.    Okay.  And so when you say at this point forward you're trying to identify him, is that -- is that what you mean?  You don't really know who he is at that moment?

A.    Correct.

Q.    Do you know that the photo he sent you is real?

A.    No.

Q.    Could be anybody?

A.    Could be anybody.

Q.    Do you know if his real name is Eric?

A.    We don't.

Q.    Do you know if he's really 30?

A.    No.

Q.    Okay.  So you're trying to identify him at that point to -- to locate the real person you've been talking to?

A.    Correct.  We've identified someone with a sexual interest in children at this point.  Now we're trying to take them off the streets so they can't harm a child.

Q.    And did it, in fact, turn out that he was Eric with an e-mail address with Cawthon who was 30 that was at the Holiday Inn, all that?

A.    Yes, sir.

Q.    And he said he would be where?

A.    Inside.

Q.    Inside?

A.    The Pilot.

Q.    The truck stop convenience store area?

A.    Yes, sir.

Q.    And you tell him what?

A.    "Text U when I get there."

Q.    He says?

1-68

A.    "Okay."

      "I'm almost there.  Will you be able to give Dez the $10.00 for gas?"

Q.    And why are you asking that?

A.    To -- just to -- just to identify him and make sure that he has it, so -- because when we arrest somebody in cases like this, we like to -- I don't know if I'm allowed to talk about other cases or how we do it sometimes.

Q.    Well, let's just talk about this case.  When you say, "Will you be able to give Dez the $10.00 for gas?" what's the point of asking that question?

A.    When we make the arrest, it's easier to identify that that was, in fact, him, because he will have the $10.00.

      So when I asked that, it's to confirm that, "Yes, I'm going to be in possession of the $10.00 I told you I would be."  Then when we arrest him, we find the $10.00, it's a way to match up that, "Yes, that was me."

      If for some reason his name isn't Eric Cawthon like he said it was, then we can still match him up based on that.

Q.    When you do these prearranged meetings and you're trying to identify the person that's showing up at a parking lot in the middle of the night or in the late, dark hours, is it sometimes hard to figure out which one they are of the many innocent people that are also using that same location?

1-69

A.    Yes, sir.

Q.    And why is that difficult to identify them?

A.    If we don't -- because we don't know who they are. They could be anyone on the Internet. You can -- you're anonymous. And so we don't know if he really is Eric Cawthon that we were talking to at the time. So we like to get identifiers out there.

We told him we're in a red truck. We'll try to get "What kind of car are you driving?" or something like that so we'll know, okay, when a red Ford Taurus pulls in, we know that's probably our -- the guy we're looking for.

Q.    And sometimes are they reluctant to just jump out of the car and say, "Here. I'm here for my 14-year-old"?

A.    Absolutely.

Q.    Okay. In this case was it that hard?

A.    No.

Q.    And, again, it was because he was driving what?

A.    A charter bus.

Q.    And as it turned out, he also had that identifier in his hand, which was what?

A.    The $10.00 bill in his hand.

Q.    He was walking across the parking lot with it?

A.    Correct.

Q.    He told you when you get there that, one, he had the money in his pocket, right?

1-70

A.    Correct.

Q.    And then the very next message before you had a chance to respond, he said what?

A.    "When you get here, go in the truck entrance."

Q.    He wanted you to come in the building?

A.    No.  He wanted us to go around the back side of the truck stop.

Q.    Okay.

A.    Because that's where the trucks go in.

Q.    Okay.

A.    Instead of the front part where the cars park, he wanted us to come around back.  And I'm assuming it's darker back there.  It's easier to hide what you're doing instead of --

Q.    Okay.  It's less public back there?

A.    Yes, sir.

Q.    Less lit?

A.    Yes, sir.

Q.    He says, "All the way past the pumps go around the end of the pumps."

Now he's giving you very specific directions as to where to go?

A.    Correct.

Q.    And you respond --

A.    "Okay."

1-71

Q.    And then he says furthermore what?

A.    "Make a right at the end and you will see my bus."

Q.    Okay.  You told him you were in --

A.    "I'm in the red truck.  Can you come get me so you can give Dez dollars?"

          And then he says, "Where are you?"

          "I'm parked behind the pumps."

          He says, "Okay."

Q.    And then what happens?

A.    At that point, our arrest team sees him exit the bus. They let him get halfway across the parking lot so that he's out in the open, he doesn't have anywhere to run, endanger anyone or himself.  There's no other cars around.  And at that point, they move in and make the arrest of him.

Q.    Okay.  And that's when he had --

A.    He had the $10.00 in his hand when the handcuffs were placed on him.

Q.    Okay.  And so that's at 11:30, correct?

A.    Correct.

Q.    Now, we see the very last message here.  It's from you, from Ashley, and it says "test" at 11:34?

A.    Correct.

Q.    Explain that to the jury.

A.    When someone is arrested, we search their person, right, to find -- to see if there's any weapons or anything

1-72

else on them.  When we searched him, he had a cell phone in his pocket.  We placed it on the hood of the vehicle.  And I send a test message as a way to make sure that's the phone we were talking to, because maybe -- maybe it's not the guy we were talking to.  Maybe it's just there was another guy in a bus that happened to be walking across the parking lot. So we send "test."  That -- that phone immediately goes off, and the -- and the message is on the screen right there, plain to see.

Q.   So quick confirmation that that's the phone at least that you've been talking to?

A.   Correct.

Q.   And you, again, said that y'all had seen him exit this charter bus that he said he would be on?

A.   Correct.

Q.   And walk across the parking lot?

A.   Yes, sir.

Q.   And had the $10.00 in his hand?

A.   Yes, sir.

Q.   Now, you said you also had a chance to interview him after the arrest; is that correct?

A.   Yes, sir.

Q.   This portion of the interview that we have here is from -- do you go through some biographical information at the beginning of the interview?

Todd Anderson, RMR, CRR    (432) 686-0605

1-73

A.    Yes, sir.  We have to take biographical information to find out his name, his date of birth, where he lives, anything like that.

Q.    Kids, things like that?

A.    Correct.

Q.    And so we're starting at about 12 minutes in, correct?

A.    Correct.

Q.    And is that the point where you read him his Miranda warnings?

A.    Yes, sir.  That's when we begin the questioning about the crime itself.

Q.    Okay.  And that's already in evidence as Government's Exhibit 6.

MR. BERRY:  May I publish, Your Honor?

THE COURT:  You may.

MR. BERRY:  And for the record, Your Honor, this is approximately 11 minutes and a few seconds that we're going to play straight through here.

(Pause)

MR. BERRY:  Let me back it up.

(Video played)

BY MR. BERRY:

Q.    Is that the end of the clip of Exhibit 6?

A.    Yes, sir.

Q.    Now, there was an additional interview that went on,

Todd Anderson, RMR, CRR    (432) 686-0605

Knight - Direct

1-74

correct?

A.    Correct.

Q.    And in that is where you also got some information about the fact that he has a 13-year-old or his girlfriend has a 13-year-old daughter, correct?

A.    Correct.

Q.    That lives with him and his girlfriend; is that right?

A.    Yes, sir.

Q.    But in the critical portion of that interview that we played, does he acknowledge that he knew she was under the age of 18?

A.    Yes, sir.  He knew she was 14.

Q.    And more specifically even said 14, almost 15, right?

A.    Yes, sir.

Q.    Which are the two things you told him, correct?

A.    Correct.

Q.    Did he also admit that he had told her he wanted her to call him daddy?

A.    Yes, sir.

Q.    Admit that he wanted her to wear a skirt with no panties, correct?

A.    Yes, sir.

Q.    And further admitted to you that he intended to have sex with her, correct?

A.    Correct.

Todd Anderson, RMR, CRR    (432) 686-0605

Knight - Cross

1-75

Q.   And that he only changed his mind after he arrived at the truck stop?

A.   Correct.

Q.   And he just happens to say that to you, correct?

A.   Yes, sir.

Q.   He -- when you asked him if he had ever told Ashley that, he said no, he didn't tell her that?

A.   No, sir.

          MR. BERRY:  Pass the witness, Your Honor.

          THE COURT:  Mr. Rogers.

                    CROSS-EXAMINATION

BY MR. ROGERS:

Q.   Agent Knight, I'm going to be pretty brief.

          Now, I understand you indicated he just happened to tell you he wasn't going to have sex with her after he got arrested, correct?

A.   Correct.

Q.   But everything you had told him up till then, that was a lie, wasn't it?  I mean, there was no Ashley?

A.   No.  No, sir.

Q.   Okay.  And you had a whole pretend conversation with him?

A.   Pretend?  I mean, we had a real conversation, but the -- but I wasn't Ashley.  I was me.

Q.   Right.

Todd Anderson, RMR, CRR    (432) 686-0605

A.   Yes, sir.

Q.   And no Ashley exists.  No 14-year-old girl existed?

A.   Correct.

Q.   And it looked like in some of those texts he would stop and you would egg him on to keep going?

MR. BERRY:  Objection, Your Honor.  This is Mr. Rogers testifying to his characterization of what he sees in the text messages.

THE COURT:  Overruled.

BY MR. ROGERS:

Q.   It would seem like in the phone conversation he would stop and you would say, "Well, what are we going to do next?"

A.   I would have to disagree, sir.  He's the one that told us to get a ride, and he's the one that asked for the picture after finding out how old we were.  It felt like he was leading.

Q.   Well, in that phone conversation he stopped and seemed to pause, and you said, "Well, what else are we going to do?"

A.   I -- it wasn't me.

Q.   Or the agent?

A.   Yes, sir.

Q.   Okay.  And it looked like in these texts and in the phone conversations both of you danced around the issue of

1-77

what was going to happen.  There was no real clarity?

A.    I think when he said that he wanted to have me undress, it went from there, have me wear a skirt with no panties, have me call him daddy, have me do what I -- what he says, that seems pretty clear.

Q.    That's your interpretation, correct?

A.    Correct.

Q.    No one ever said, "We're going to have sexual intercourse"?

A.    Correct.

Q.    No one ever said, "We're going to have oral sex"?

A.    No.

Q.    And you talked about an arrest team.  How many officers were involved in the arrest team?

A.    I couldn't give you a firm number.  I think it was six or eight.

Q.    Uniformed officers?

A.    Most -- most of the people there were, like, police officers that wear a uniform and drive a marked vehicle.  But the ones who made the arrest were all in, like, marked vests, because I think they were FBI and troopers.

Q.    And were they wearing bulletproof vests --

A.    Yes.

Q.    -- or tactical vests?

A.    Yeah, with markings showing "police."

Q.    Okay.  And they were armed?

A.    Correct.

Q.    And you told him -- well, you said you try to use texts like kids, but kids aren't the only ones that use abbreviations?

A.    No.

Q.    I mean, he had some misspellings?

A.    Yes, sir.

Q.    Is it fair to say -- or let me ask you this, because I don't want to put words in your mouth.

At what point did you determine, either after the phone conversation or through the text, that you were definitely going to make an arrest?

A.    After the phone conversation was when we affirmed that -- before we were -- we had, you know, reason to believe and then, like, a reasonable suspicion almost. After the phone conversation, it was -- it was pretty confirmed what we were talking about.

Q.    And I think you said after that that was the point of no return?

A.    Correct.

Q.    He crossed the Rubicon, for lack of a better word?

A.    Correct.

Q.    And you told him in that interview that you wanted to work together.  What did that mean?

1-79

A.   I don't -- I don't remember that exact phrase, but --

Q.   You said, "We're going to work together."  What did you
mean by that?

A.   That I would explain to the prosecutor that he was
cooperative as far as the investigation goes.

Q.   Okay.  And you also told him at some point later on the
tape but we didn't see it that you were trying to help him
out.  What did you mean by that?

A.   The same thing; that when you're -- when you're -- you
know, how I was raised, when you make a mistake, you've got
to own up to it, and it's better to own up to it than it is
to lie about it and make it worse.

Q.   Okay.

        MR. ROGERS:  That's all I -- well, may I approach
Your Honor?

        THE COURT:  You may.

        (Bench Conference on the record)

        MR. ROGERS:  Certainly I can make a bill on this
later, but we would argue that based on what the officer
said, that this isn't as bad as what you think, he was not
looking to rape little kids, he was just trying to help him,
they've opened the door for me to get into what the
mandatory minimum is.

        THE COURT:  Okay.  Denied.  But you can make a
bill later.

Todd Anderson, RMR, CRR     (432) 686-0605

MR. ROGERS:  Thank you.

(End of Bench Conference)

THE COURT:  Any redirect, Mr. Berry?

MR. BERRY:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. BERRY:

Q.   Agent Knight, Mr. Rogers -- Mr. Rogers was asking you about the words that were used and how the Defendant never explicitly said in the text messages or the phone calls, "I want to have sexual intercourse" or, "I want to have oral sex."  Do you remember that line of questioning?

A.   Yes, sir.

Q.   But in your interview of the Defendant, did you explicitly ask him, "Did you intend to have sex with this girl?"

A.   I did.

Q.   And what was his answer unequivocally?

A.   Yes, he intended to have sex with a minor.

MR. BERRY:  No further questions.

THE COURT:  Mr. Rogers, anything else?

MR. ROGERS:  No, Your Honor.

THE COURT:  Okay.  You may step down.

(Witness excused)

THE COURT:  Let's take a recess here for a few minutes.  I would ask you to leave your notepads here in the

1-81

courtroom.  Don't discuss the case among yourselves.  And we will take about a 10- or 15-minute recess.

Let's all rise for the jury, please.

(Jury out)

THE COURT:  All right.  We will be in recess for about 15 minutes.

(Recess from 3:05 to 3:22)

THE COURT:  You can be seated.

All right.  It is 3:22.  We're outside the presence of the jury.  The attorneys are present, and Mr. Cawthon is present.

Mr. Berry, is the Government going to put on any more evidence on direct?

MR. BERRY:  No, Your Honor.

THE COURT:  Okay.  So the Government rests?

MR. BERRY:  Yes, Your Honor.

THE COURT:  Would you like to make your Rule 29 motion at this time, Mr. Rogers?

MR. ROGERS:  Yes, Your Honor.  At this time the defense moves for a Rule 29, judgment of acquittal.

The Government has failed to meet the elements of 18 U.S.C. 2422(b).  Further, they're able to -- they are unable to show that this would have been a crime under 43.25, Sexual Performance By a Child.

THE COURT:  Mr. Berry?

1-82

MR. BERRY:  Your Honor, the United States has put on evidence on each and every element of the offense.  And, indeed, the Defendant has confessed to each and every element of the offense, including that he intended to have sex with this child, which certainly qualifies as sexual conduct under Texas Penal Code 43.25.

THE COURT:  In reviewing the evidence in a light most favorable to the Government and taking all inferences in favor of the Government and resolving all issues of credibility in favor of the Government, the Court finds that a rational and reasonable juror could find the Defendant guilty beyond a reasonable doubt on each of the elements set forth in the one count of the indictment, and respectfully overrules the Defendant's motion.

Could you stand up just a minute, Mr. Cawthon?

Mr. Cawthon, you have the right to testify or not testify.  The decision to testify is yours and yours alone. You can ask Mr. Rogers for his advice, but the decision whether or not to testify is yours.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  Why don't you and Mr. Rogers visit here for just a second and let me know what it is you want to do.

(Pause)

MR. ROGERS:  We conferred, Your Honor, and we

Todd Anderson, RMR, CRR     (432) 686-0605

1-83

spent a great part of the lunch hour conferring about this very issue.

THE COURT:  Okay.  So is he going to testify?

MR. ROGERS:  He's going to testify.

THE COURT:  Okay.  Good.  So, I mean, I just don't want to bring the jury in and then back and forth.  And so I will let the Government rest, then let you put on just -- and you've reserved your Rule 29 motion, just to have them formally say they're going to rest, and then you can call Mr. Cawthon.

MR. ROGERS:  Do you want me to put Agent Knight on?  It's two questions.

THE COURT:  We can do that afterwards.  We will do that --

He wants to make a bill --

MR. BERRY:  Oh.

THE COURT:  -- on some matters.  And so we'll do that after we let the jury go today.

MR. ROGERS:  Yes, sir.

THE COURT:  Okay.  All right.  Now you can bring the jury in.

Let's all rise.

(Jury in)

THE COURT:  All right.  Let's all be seated.

It's 3:25, and we're back in the courtroom with

1-84

the jury.  And the attorneys are present.  Mr. Cawthon is present.

Mr. Berry, does the Government desire to put on any other evidence in this case?

MR. BERRY:  No, Your Honor.  The United States rests.

(Government rests)

THE COURT:  All right.  And at this time the Government has rested, putting on what we call its case in chief.  And the Defendant may -- remember, the Defendant is presumed to be innocent.  There's no obligation by the Defendant to put on any testimony, but the Defendant may, if he desires, put on testimony.

Mr. Rogers, do you desire to call any witnesses?

MR. ROGERS:  Yes, Your Honor.  We call Mr. Cawthon.

THE COURT:  Mr. Cawthon, if you could come up here and be sworn as a witness, please.

(Pause)

THE CLERK:  If you will stop here and raise your right hand, please.

(The Defendant was sworn)

THE CLERK:  Have a seat.

THE COURT:  All right.  Mr. Rogers, you may proceed.

ERIC WARNER CAWTHON, DEFENDANT, SWORN

DIRECT EXAMINATION

BY MR. ROGERS:

Q.   Tell us your name, please.

A.   Eric Warner Cawthon.

Q.   How old are you, Mr. Cawthon?

A.   30.

Q.   And, Eric, a little bit -- I don't want to belabor the point, but where did you grow up?

A.   Amarillo, Texas, sir.

Q.   Did you graduate from high school there?

A.   Yes, sir.

Q.   After high school what did you do?

A.   I joined the Marine Corps.

Q.   How long were you in the Marine Corps?

A.   Four years, three months.

Q.   And what was your MOS?

A.   I was an LAV crewman, very similar to the Bradley instructor vehicles.

Q.   Okay.  After -- what does that in civilian life translate to?

A.   Truck driving, I mean, outright.

Q.   And after you got out of the United States Marine Corps, did you have an honorable discharge?

A.   Yes, sir.

Cawthon - Direct

1-86

Q.    What did you start doing?

A.    I got my CDL while I was in the Marine Corps.  I got it as a backup plan.  And I started driving.

Q.    How old were you when you got out of the Marine Corps?

A.    I would have been 22 or '3.

Q.    How long did you drive trucks for?

A.    Off and on, since then.

Q.    Okay.  And what jobs have you had in between?

A.    I was an electrician's apprentice.  I worked at a newspaper for a little while.  Various other ones.  Just handyman, whatnot.

Q.    What do you like to do?

A.    I like to drive.

Q.    And what kind of trucks were you driving predominantly?

A.    Over-the-road.

Q.    What do you mean, over-the-road?

A.    Cross-country.  I would leave home on Friday and be gone two to three weeks, sometimes longer, sometimes shorter.

Q.    All right.  Now, what was your job when you were arrested?

A.    I worked for a charter bus company.  I had just started that job.  I think I had finally found the part of driving that I really enjoyed.

Q.    Okay.  What kind of bus was it?

Todd Anderson, RMR, CRR    (432) 686-0605

A.    A Greyhound-style bus.  I was driving a baseball team.

Q.    What team was it?

A.    I think it's Oklahoma Panhandle State University or -- it's OPSU is what it was referred to.

Q.    Was it a junior college team?

A.    I couldn't tell you, sir.  I believe so.

Q.    Where were you driving from?

A.    Goodwell, Oklahoma.

Q.    And where were you driving to?

A.    Midland-Odessa area for a baseball game.

Q.    Okay.  Was the tournament in this area?

A.    I believe so, sir.

Q.    And what was the plan?  Were you here for a few days?

A.    Yes, sir.

Q.    All right.  And do they put you up in a hotel?

A.    Yes.  That's part of the cost to whoever charters the bus.

Q.    And we have heard -- seen the texts and heard the phone conversation, but have you had those types of conversations not with a 14-year-old but with other women?

A.    Yes, sir.

Q.    Okay.  Where would you do that?

A.    Various places.  It's been on the Internet with IM and texts or at the truck stop, outside the truck stop.  And most of the time they turned out to be professionals or

Cawthon - Direct

1-88

hookers and --

Q.   Is that something you would do to pass the time while you were driving?

A.   Yes, sir, just speak to them.

Q.   And would it be over the phone, or would it be -- I don't want to date myself, but do you still use CBs?

A.   Yes, sir.  Both over the phone and using a CB.

Q.   Now, let's talk about this specific night in question. Where did you see -- what were you doing that drew your attention to a Craigslist ad in Midland, Texas?

A.   I was just here killing time.

Q.   Okay.

A.   I had brought the baseball team down.  They adjourned for the evening, and I was just killing time.

Q.   A lot of people kill time in different ways.  You were looking at what?

A.   Just to talk to someone.

Q.   Well, what were you looking at?

A.   The Internet and Craigslist.

Q.   And is Craigslist nationwide?

A.   Yes, sir.

Q.   And did you go to the personals section?

A.   Yes, sir.

Q.   And what were you looking for or under?

A.   The "Casual Encounters, Women For Men."  And it's kind

Cawthon - Direct

1-89

of like a singles bar.

Q.    And what was the ad you responded to, if you remember?

A.    "Home Alone, Bored," something like that.

Q.    Okay.  And then -- I mean, we have seen the texts and the e-mails, but you sent an e-mail?

A.    Yes, sir.

Q.    And then you responded to Ashley, or the agent responded to you or to that e-mail?

A.    Yes, sir.

Q.    And shortly into the conversation, she says she can't drive?

A.    Yes, sir.

Q.    And you asked, "How old are you?"  She says "14."  And you respond with that you're 30?

A.    Yes, sir.

Q.    Why did you continue that conversation?

A.    I honestly did not believe that she was 14.  I didn't believe that a 14-year-old girl would be interested in me.  I'm 30.  I'm heavy-set.  I have a receding hairline.  I just didn't think that she would be interested in me.

Q.    Okay.  What did you -- and you have -- well, do you have a girlfriend?

A.    Yes, sir.

Q.    Okay.  And Mr. Berry brought out that she has a daughter?

Cawthon - Direct

1-90

A.    Yes, sir.

Q.    Do you ever text with her?

A.    No, sir.

Q.    All right.  Are you familiar with how teenagers text?

A.    No, sir.

Q.    And you continued to engage in this conversation.  What were you thinking?

A.    That this isn't real; this is just somebody's game; it's what somebody is into.  I didn't know if someone was just into that or whatnot.

Q.    And I know that you haven't had conversations where someone is saying they're 14 before, but, again, had you engaged in similar conversations of this while you're driving a truck or when you're stuck on the road?

A.    Yes, sir.

Q.    Now, you asked to talk to her on the phone?

A.    Yes, sir.

Q.    Why did you ask to talk to her on the telephone?

A.    Just to see who she was and if it was actually a person or if it was -- if it was all on the up-and-up, if it was somebody who was going to just be a prostitute.

Q.    Okay.  And after talking to the police officer, what did you think?

A.    That this wasn't real.

Q.    Okay.  Did you believe at any time you were speaking

with a 14-year-old girl?

A.    No, sir.

Q.    Okay.  At some point you make the agreement to meet up?

A.    Yes, sir.

Q.    All right.  Why did you choose a truck stop?

A.    Because I could get the bus in and out of there, and I had to buy a cell phone cord.

Q.    Why didn't you just have her meet you at the hotel?

A.    Because I was going to be out.  I didn't -- I wanted to meet her in a public place to, again, make sure that she wasn't a hooker.

Q.    And what was your intent?

A.    On the way over there, I was going to talk to her and see that she wasn't a hooker, make sure that she was a real person and of age and everything.  If she was into being weird like that, that's her thing, not mine.  And then on the way over there I decided I can't do this.

Q.    Now, let's go back to the phone conversation.

A.    Yes, sir.

Q.    You were fairly specific in some things you like?

A.    Yes, sir.

Q.    You seemed to say -- well, you didn't seem to say.  You said, "I want you to come over wearing a miniskirt without panties"?

A.    Yes, sir.

Cawthon - Direct

1-92

Q.    Why did you say that?

A.    That's just a personal preference.  It has nothing to do with how old she was.  It -- I've asked my girlfriend to do that.

Q.    And you said, "I want you to call me daddy"?

A.    Yes, sir, the same thing.  I've asked my girlfriend to do that.

Q.    Okay.  Was that list or that itinerary on the phone personal preferences?

A.    Yes, sir.

Q.    Okay.  And, again, we heard the conversation you never said you wanted to have sex with anyone, did you?

A.    Yes, sir, I did -- or, no, sir, I did not.

Q.    Okay.  Now, what -- and we've seen the texts, again, but at some point she says -- or they tell you, "Hey, it's going to be 40 minutes," and you say, "No, come ASAP."

A.    No, sir.  I had sent the message at the same time she had sent it, basically just telling her that I was not very far from the place.

Q.    Okay.  And why did you offer the $10.00?

A.    They're having to drive further than they thought.  I was just going to be polite and give them gas money.

Q.    And I guess the question is, if you didn't believe it was a 14-year-old coming, why would you offer to give gas money?

Todd Anderson, RMR, CRR     (432) 686-0605

1-93

A.    Because somebody had to drive them across town. Somebody went out of their way.  I just wasn't going to be a jerk.  I had said to them that I was going to give them gas money, and that's what I was going to do.

Q.    All right.  And then you show up at the Pilot?

A.    Yes, sir.

Q.    And then how long are you waiting at the Pilot?

A.    Ten, 15 minutes.  Long enough to go in and buy a cell phone cord and use the restroom.

Q.    Okay.  And did you accomplish that?

A.    Yes, sir.

Q.    And then how long were you in the bus, waiting --

A.    Five or ten minutes.

Q.    -- for the red truck?

      And what happened when the red truck showed up, or did you ever see the red truck?

A.    I never saw the red truck.

Q.    All right.  What happened?

A.    She texted me and said that she was here, and I decided that I wasn't going to do this.  I was taking my money to her, and I was going to go home or to my home for the evening, which was the motel.

Q.    And then do you ever exit the vehicle?

A.    Yes, sir.

Q.    All right.  And what happened when you exit?

Cawthon - Direct

1-94

A.    I started to walk over there, and then I stopped about halfway over there and started to turn back towards the bus, and I'm arrested.

Q.    Okay.  And how many officers were involved, if you remember?

A.    More than five.  I honestly couldn't tell you.

Q.    And what happens next?

A.    I was taken to the ground and arrested.

Q.    Okay.  And where did they transport you to?

A.    The DPS office.  I believe it's in Midland.  I'm not actually familiar with the area.

Q.    And they read you your Miranda warnings?

A.    Yes, sir.

Q.    And you agreed to make a statement?

A.    Yes, sir.

Q.    And you also agreed to a search of your phone?

A.    Yes, sir.

Q.    Okay.  Now, the testimony you're providing today is different than the testimony you gave to the case agent, correct?

A.    Yes, sir.

Q.    Can you explain that to the jury, what the difference is?

A.    Yes, sir.  When they picked me up, he made it out that if I helped him, it would be just kind of a slap on the

Todd Anderson, RMR, CRR    (432) 686-0605

wrist and I would go home.  He said specifically that I wasn't who they were looking for.  He made it seem that he was my friend and he was trying to help me.  He made me feel that if I spoke to him about it -- he said specifically, "You're not the guy we're looking for."

Q.    Now, in that, did you know at the time that what you were doing was illegal?

A.    No, sir.

Q.    Okay.  When did you realize that you may have some problems?

A.    As I was driving over to the truck stop.

Q.    Okay.  What about when they arrested you?

A.    Yes, sir.

Q.    What about when they took you to the police station?

A.    Yes, sir.

Q.    What about when they read you your Miranda warnings?

A.    Yes, sir.

Q.    Okay.  Now, why would you tell them that you knew that the girl was 14?

A.    I was in shock.  I have never been in trouble before. And they didn't ask me to elaborate.  They had it on paper. They wanted yes or no answers.

Q.    Is that from your drill sergeant days?

A.    Yes, sir.

Q.    And why on earth would you tell them that you intended

to have sex with the girl?

A.    The same thing.  They didn't ask me to elaborate if I changed my mind or anything like that.  They just wanted yes or no answers.

Q.    Did you expect to be let go?

A.    Yes, sir.  When he said, "It's not as bad as you think it is," I thought that I was going home.

Q.    When did you realize you weren't going home?

A.    When we went to Midland County.

Q.    All right.  Did you ever believe that you were speaking with a 14-year-old?

A.    No, sir.

Q.    Did you ever think that you were involved in any way whatsoever with a 14-year-old?

A.    No, sir.

Q.    All right.  Did you ever intend to have any type of sex with a 14-year-old?

A.    No, sir.

        MR. ROGERS:  No further questions.  Pass the witness.

        THE COURT:  Mr. Berry.

        MR. BERRY:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. BERRY:

Q.    Good afternoon, Mr. Cawthon.  Now, it was, in fact, you

Cawthon - Cross

1-97

who responded to that Craigslist ad about being home alone
and bored, correct?

A.    Yes, sir.

Q.    That was you?

A.    Yes, sir.

Q.    It wasn't somebody else, correct?

A.    No, sir.

Q.    And it was, in fact, you who provided the phone number
806-676-7597, correct?

A.    Yes, sir.

Q.    That's your cell phone?

A.    Yes, sir.

Q.    And it was, in fact, you that was doing all the texting
that we saw those messages of within the last hour or two,
correct?

A.    Yes, sir.

Q.    It was, in fact, you who sent the address, the e-mail
address ECawthon0313@Gmail.com.  That's your e-mail address,
correct?

A.    Yes, sir.

Q.    You, in fact, told the truth throughout this whole text
messages.  You are, in fact, 30, right?

A.    Yes, sir.

Q.    Your name is really Eric?

A.    Yes, sir.

1-98

Q.    You really drive a charter bus?

A.    Yes, sir.

Q.    Correct?

      You provided all this information here.  And none of that was fantasy or a game or any kind of play, correct? That was all real, wasn't it?

A.    No, sir.  I believed that part of it was fantasy.  I believed that this was an adult that was into that.

Q.    Let me rephrase the question.  The things that you said -- "I'm Eric.  I'm 30.  I drive a charter bus" -- those are all real?

A.    Yes, sir.

Q.    That's not fantasy, is it?

A.    No, sir.

Q.    That wasn't a game, was it?

A.    No, sir.

Q.    That wasn't just you being into being a 30-year-old white male charter bus driver, right?  That wasn't a fantasy?

A.    No, sir.

Q.    And it was, in fact, you who sent this picture, correct?

A.    Yes, sir.

Q.    That's a picture of you actually?

A.    Yes, sir.

Q.   And there you have a goatee, and you don't have one today, do you?

A.   No, sir.

Q.   When did you shave that off?

A.   While I -- in the past month or so.

Q.   Do you think you look younger or older with a goatee?

A.   I couldn't tell you, sir.

Q.   Are you trying to look a little younger today?

A.   No, sir.

Q.   You also -- it was, in fact, you that received this picture of this girl, correct?

A.   Yes, sir.

Q.   And you, in fact, did receive the messages on two occasions where she said she was 14, almost 15, correct?

A.   Yes, sir.

Q.   You saw all that at the time that night?

A.   Yes, sir.

Q.   You are, in fact, the one that asked her, "Can you get a ride?"  You asked her if she could get a ride, correct?

A.   Yes, sir.

Q.   You're the one that when she said -- when she sent the picture, you told her she looks pretty, correct?

A.   Yes, sir.

Q.   And that was after she told you your [sic] age, correct?

Cawthon - Cross

1-100

A.    Yes, sir.

Q.    Her age, correct?

A.    Yes, sir.

Q.    And, in fact, when she told you her age, you said, "Do you have a picture?"  That's the first thing you said; isn't that right?

A.    Yes, sir.

Q.    You never said, "Oh, this is a fun game.  I like to play this game," anything like that, did you?

A.    No, sir.

Q.    You never said, "Oh, this is a fun fantasy.  I've done this a hundred times with prostitutes before."  You never did that, never said that, did you?

A.    No, sir.

Q.    And it was, in fact, your voice we heard on that phone call with who you thought was Ashley at the time, right?

A.    Yes, sir.

Q.    And it was, in fact, you who said, "I just don't want to get arrested," right?

A.    Yes, sir.

Q.    You did, in fact, say, "I want you to wear a skirt," correct?

A.    Yes, sir.

Q.    And initially you wanted a thong, but then you changed and said, "No, no.  No panties," right?

Cawthon - Cross

1-101

A.   Yes, sir.

Q.   And you were, in fact, the one that told this person that you wanted her to call you daddy, right?

A.   Yes, sir.

Q.   And you do, in fact, have -- your girlfriend does, in fact, have a 13-year-old girl, correct?

A.   Yes, sir.

Q.   Does she call you daddy?

A.   No, sir.

Q.   What does she call you?

A.   Eric.

Q.   So this personal preference of yours for your girlfriend to wear a skirt, no panties, call you daddy, that's what you were saying at this time --

          MR. BERRY:  Leave them off, please.  I may go through some more.

BY MR. BERRY:

Q.   You said that was your personal preference, correct?

A.   Yes, sir.

Q.   And so that's why you were telling this person, this Ashley that, correct?

A.   Yes.

Q.   Because you wanted her to do that?

A.   Yes, sir.

Q.   And at no point in the conversation did you say, "This

Todd Anderson, RMR, CRR    (432) 686-0605

is -- this is my favorite game to play, is to have an adult woman pretend to be a 14-year-old." You never said that, did you?

A.   No, sir.

Q.   You never tried to make it clear that she was, in fact, of age and that she was just pretending to be 14. You never asked that question, did you?

A.   No, sir.

Q.   You never said, "Hey, this is a fun game for me, but I just want to make sure you're really 18," right?

A.   No, sir.

Q.   You never did that, did you?

A.   No, sir.

Q.   But this was all a game for you?

A.   Yes, sir.

Q.   This was something fun to do?

A.   Yes, sir.

Q.   A fantasy?

A.   No, sir.

Q.   Not a fantasy?

A.   With an underage woman, it is not a fantasy of mine, sir.

Q.   It's just a game?

A.   Yes, sir.

Q.   So it was a game for you to pretend to have sex with a

14-year-old girl?

A.    No, sir.  I believed -- I believed that she was 18.  I believed that she was into lying about her age.

Q.    Okay.  But she never said, "I'm really 18, but let's play this game," did she?

A.    No, sir.

Q.    And you never tried to clarify that that was the case, did you?

A.    No, sir.

Q.    Instead, you said things like, "I don't want to get arrested," right?

A.    Yes, sir.

Q.    You said things like, "I just want to make sure you're not a cop and this isn't a sting," right?

A.    Yes, sir.  I was worried about her being a prostitute.

        MR. BERRY:  Objection, Your Honor.  Nonresponsive.

        THE COURT:  Sustained.

BY MR. BERRY:

Q.    And you can play all kinds of games on the Internet. You agree with me with that, don't you?

A.    Yes, sir.

Q.    I mean, you can play Soduku, correct?

A.    I don't know what that is, sir.

Q.    Can you play Fruit Ninja?

A.    I believe so.

Q.   What kind of games do you like to play on the Internet?

A.   I don't, sir.

Q.   Do you have a smartphone?

A.   Yes, sir.

Q.   Do you have any game apps on there that you play?

A.   I don't remember what they were.

Q.   Okay.

A.   Jurassic Park was one of them.

Q.   Jurassic Park, you can play that on there, right?

A.   Yes, sir.

Q.   All kinds of games you can play on the Internet?

A.   Yes, sir.

Q.   On this night, though, the game you chose to play was to pretend to have -- meet up and have sex with a 14-year-old, right?

A.   No, sir.  I believed that she was 18.

Q.   But you were pretending that this was the game, right?

A.   Yes, sir.

Q.   You thought she was 18, pretending to be 14?

A.   Yes, sir.

Q.   That was the game, right?

A.   Yes, sir.

Q.   So the game was you, Eric, 30-year-old charter bus driver, was showing up in real life to have sex with someone who said she was under the age of 18?

A.    No, sir.

Q.    Did she or not say -- did she or did she not say she was under the age of 18?

A.    She did, but I believed that she was 18.

Q.    So my question is, the game was for you to show up to have sex with someone who said they were under the age of 18, correct?

A.    Yes, sir.

Q.    Not someone who said they were over 18, pretending to be 14?

A.    No, sir.

Q.    And when you were arrested and Agent Knight interviewed you, you never said to him this was all a game, did you?

A.    No, sir.

Q.    You never said to him, "Look, I thought she was over 18.  She was just a little weird, and I was just going with it."  You never said that, did you?

A.    No, sir.

Q.    In fact, you told him you thought she was underage, correct?

A.    Yes, sir.

Q.    You told her -- you told the agent that, yes, it was you who sent those messages, correct?

A.    Yes, sir.

Q.    You told the agent, yes, you intended to have sex with

her before you arrived there, correct?

A.    Yes, sir.

Q.    And at no point in there did you ever say, "I really thought she was 18."  You never told the agent that one time, did you?

A.    No, sir.

Q.    And, again, part of the game, right, is your personal preference to have her call you daddy, correct?

A.    Yes, sir.

Q.    And you, in fact, told the agent that's what you like, is to have her call you daddy, correct?

A.    Yes, sir.

Q.    And you said that you have done this on the Internet before, correct?

A.    Yes, sir.

Q.    You have talked to other women on the Internet before?

A.    Yes, sir.

Q.    And you said that they normally turn out to be prostitutes, correct?

A.    Yes, sir.

Q.    How many of them have pretended to be 14 when you've talked to them on the Internet?

A.    Seven.

Q.    Seven?

A.    Yes, sir.

1-107

Q.   You've talked to seven different women who said they were 14?

A.   Yes, sir.

Q.   And you talked to them in this way?

A.   Yes, sir.

Q.   And how many of them did you show up to try to meet?

A.   One.

Q.   Okay.  But she wasn't 14?

A.   No, sir.

Q.   She turned out to be of age?

A.   Yes, sir.

Q.   But you went through this whole similar conversation with her?

A.   Yes, sir.

          MR. BERRY:  Pass the witness.

          THE COURT:  Mr. Rogers.

          MR. ROGERS:  Eric, just a couple.  One --

          THE COURT:  Turn the lights on.  Turn the lights on, please.

          Go ahead.

                    REDIRECT EXAMINATION

BY MR. ROGERS:

Q.   When you're involved in these conversations, you don't stop in the middle of them and go, "Hey, this is just a game," right?

1-108

A.    No, sir.

Q.    It spoils -- it's a mood killer, isn't it?

A.    Yes, sir.

Q.    Okay.  And you said on there a few times you didn't want to get arrested.  What did you mean?

A.    I didn't want to get arrested for a prostitution sting. I --- that's what I was trying to figure out, was if she was a prostitute.

MR. ROGERS:  Can I have a word back here with my client, Judge?

THE COURT:  Not during the examination.

MR. ROGERS:  Okay.  Well -- Okay.  I don't have any further questions, Judge.

THE COURT:  Okay.  Mr. Berry, anything else on recross?

RECROSS-EXAMINATION

BY MR. BERRY:

Q.    Mr. Cawthon, Mr. Rogers just asked you if it would be a mood killer to sort of lay the groundwork that this was really an adult that you were talking to.  Do you remember that question he just asked you?

A.    Yes, sir.

Q.    In fact, on that phone call that we listened to you on, there was a lot of heavy breathing going on in that phone call.  Could you hear that?

A.    Yes, sir.

Q.    What was going on in your room that day?

        MR. ROGERS:  Objection to relevance, Your Honor.

        THE COURT:  Overruled.

        MR. ROGERS:  If I could just have a running objection.

        THE COURT:  You may.

        MR. ROGERS:  Objection 401, 402, and unfairly prejudicial under 403.  And if I could just have a running objection.

        THE COURT:  You may.

BY MR. BERRY:

Q.    Mr. Cawthon, we hear a lot of heavy breathing on that phone call.  Do you agree with that?

A.    Yes, sir.

Q.    Were you on the treadmill?

A.    No, sir.

Q.    Were you on the StairMaster?

A.    No, sir.

        MR. BERRY:  No more questions.

        THE COURT:  Mr. Rogers, anything else?

        MR. ROGERS:  No, Your Honor.

        THE COURT:  Okay.  You can step down.  Thank you.

        (Pause)

        THE COURT:  Mr. Rogers, any other evidence that

1-110

you would like to produce?

MR. ROGERS:  No, Your Honor.  If I could just confer with my client for a second.

THE COURT:  Okay.

(Pause)

MR. ROGERS:  Defense rests.

(Defendant rests)

THE COURT:  Okay.  Does the Government have anything else it would like to offer?

MR. BERRY:  No, Your Honor.  The United States closes.

(Government closes)

THE COURT:  All right.

MR. ROGERS:  Defense closes.

(Defendant closes)

THE COURT:  Ladies and gentlemen, we've heard all of the evidence in this case.  We've been working on the Court's instructions, but wouldn't have them ready.  It would take us about an hour or so to get them all finally completed and everything, so I'm going to ask you to come back in the morning at 9:00.

And what we'll do in the morning is I will read to you the Court's instructions and let the attorneys make their closing arguments.

And I would ask you to take your notepads back

1-111

into the jury room.  And in the jury room there are some brown envelopes.  If you would put your notepad in there.  I think there's a little string to tie it up.  Then write your name on the outside of the envelope so everybody will know whose is whose.

I would ask you not to discuss the case with anybody.  Don't let anybody discuss it with you.  Don't do any research or investigation about the case.  And we'll see you back here in the morning ready to go at 9:00 a.m., all right?

Let's all rise for the jury, please.

(Jury out)

THE COURT:  All right.  Let's be seated.

Mr. Rogers, do you have another motion that you would like to make?

MR. ROGERS:  Yes, Your Honor.  At this point, again we would reurge our Rule 29 motion for judgment of acquittal.

THE COURT:  Mr. Berry, do you make your same argument that you made earlier?

MR. BERRY:  Yes, Your Honor.

THE COURT:  Okay.  The Court in reviewing the evidence in a light most favorable to the Government, resolving all issues of credibility in favor of the Government, taking all inferences in favor of the

1-112

Government, which is the standard of review for a Rule 29 motion, the Court finds that a rational and reasonable juror could find the Defendant guilty beyond a reasonable doubt on each of the elements set forth in the one count of the indictment, and respectfully overrules the Defendant's motion.

All right.  Let's go -- let me see the attorneys back in chambers.  We'll finish working on the jury instructions.

Oh, you want to do your -- let's do your bill right now.

MR. ROGERS:  Thank you, Judge.

THE COURT:  Can we put the agent back on the stand so we can do a bill real quick?

MR. ROGERS:  I'll call Agent Knight.

THE COURT:  Agent Knight.

(Pause)

THE COURT:  And, Agent Knight, you've been previously sworn and testified.  You understand you're still under oath?

THE WITNESS:  Yes, sir.

THE COURT:  And this testimony is outside the presence of the jury to make a bill of review for Mr. Rogers.

Go ahead, Mr. Rogers.

Todd Anderson, RMR, CRR    (432) 686-0605

MR. ROGERS:  Thank you.

KRISTOPHER KNIGHT, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. ROGERS:

Q.   Agent Knight, you're aware that the Defendant in this case has been charged with 18 U.S.C. 2422, basically solicitation of a child?

A.   Correct.

Q.   Are you aware that that charge carries a 10-year mandatory minimum?

A.   Yes, sir.

MR. ROGERS:  No further questions, Your Honor.

THE COURT:  Okay.  Anything, Mr. Berry?

MR. BERRY:  Your Honor, obviously if this were to be in front of the jury, we would object to this line of questioning under the in limine already ruled on by the Court.  No further questions, though.

THE COURT:  Okay.  You can step down.  Thank you.

THE WITNESS:  Yes, sir.

THE COURT:  The Court, in accordance with its previous ruling on the Government's motion in limine, finds that because sentencing is an issue for the Court, not for the jury, that it would have no relevancy in this case.

So, with that, we'll be adjourned until 9:00 a.m. tomorrow morning.

1-114

I would like to have the attorneys be here in the morning at 8:30, and we can -- but I would like for you to come back now, and we'll work on the Court's instructions. And then we'll take objections to the charge in the morning at 8:45.

Okay.  With that, we'll be adjourned until tomorrow morning.

(Recessed for the day at 3:57)

Todd Anderson, RMR, CRR    (432) 686-0605

1-115

I, TODD ANDERSON, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Dallas Division, hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 8th day of October, 2014.


                              /s/Todd Anderson
                              TODD ANDERSON, RMR, CRR
                              United States Court Reporter
                              1100 Commerce, Rm. 1625
                              Dallas, Texas  75242
                              (214) 753-2170

Todd Anderson, RMR, CRR    (432) 686-0605