1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | MO-14-CR-93 |
| | ) | |
| | ) | |
| VS. | ) | **Closing Statements** |
| | ) | |
| | ) | |
| ERIC WARNER CAWTHON | ) | July 15, 2014 |

**BEFORE THE HONORABLE ROBERT JUNELL**
**UNITED STATES DISTRICT JUDGE**
**In Midland, Texas**

| | |
|---|---|
| **FOR THE GOVERNMENT:** | **MR. JOHN S. KLASSEN**<br>**MR. AUSTIN BERRY**<br>Assistant United States Attorneys<br>400 W. Illinois, Suite 1200<br>Midland, Texas  79701<br>(432) 686-4110 |
| **FOR THE DEFENDANT:** | **MR. DAVID G. ROGERS**<br>Fivecoat & Rogers<br>214 W. Texas Avenue, Suite 811<br>Midland, Texas  79701<br>(432) 620-8774 |
| **COURT REPORTER:** | **MR. TODD ANDERSON, RMR, CRR**<br>United States Court Reporter<br>1100 Commerce, Rm. 1625<br>Dallas, Texas  75242<br>(432) 686-0605 |

        The above-styled and numbered cause was reported by
mechanical stenography and produced by computer.

2

                              INDEX

CLOSING STATEMENT:  Mr. Berry......................... 3,26

CLOSING STATEMENT:  Mr. Rogers......................... 19

3

(July 15, 2014)

(Defendant present)

(Jury present)

THE COURT:  Now, I'm going to stop right there and recognize Mr. Berry to make an opening closing argument on behalf of the Government.

Mr. Berry.

MR. BERRY:  Thank you, Your Honor.  May it please the Court.

THE COURT:  Yes, sir.

MR. BERRY:  Mr. Rogers, Mr. Cawthon.

CLOSING STATEMENT

BY MR. BERRY:

Ladies and gentlemen of the jury, here we are again.  As I told you yesterday afternoon when I stood up here, I tried to give you a preview of what evidence you would see and told you that at the end I would be -- would have an opportunity to face you once again and explain each of the seven exhibits, the parts thereof, that support the charges or the charge against the Defendant, which is the attempted enticement of a juvenile to engage in sexual activity.

Could we turn off the lights?  Thank you.

The Judge has just read to you the instructions. I will probably refer to a few portions of them when we get

4

through there.

My function here today at this point is to point you to the direct exhibits that support the charges and to help you understand some of the instructions as to the way it supports the United States's allegation.

So the first couple of things to look at that, on page 6 -- I think that's still the right page.  Yes. "Punishment Judge's Duty."

It's something that you should not worry about. If any of you have ever served in State court, you know that in the State system you would not only find guilt or innocence -- guilty or not guilty, but you would also then, if you found them guilty, decide the punishment.  Not the case here.  All you have to worry about here today is whether -- you decide whether he is guilty or not guilty. Judge Junell will have an opportunity to take in all kinds of other factors in assessing punishment, and that is the Judge's duty there.

In addition, on page 4 it talks about circumstantial evidence.  And that's one thing that you may recall Judge Junell gave you the example yesterday of the mailbox and the mailman and what's direct versus circumstantial.  And I think there's sometimes a notion that, well, it's circumstantial.  Nobody actually saw him on the computer typing these messages or something along those

5

lines.

And what you recall from what Judge Junell told you yesterday is that actually makes no difference in the law, right?  That direct and circumstantial are considered of equal weight.  And that's an important thing to keep in mind.

And then also, page 5, "Consider Only the Crime Charged."  Another thing that, as Judge Junell talked about, if somebody watches Law & Order and thinks they have an idea of the way the court system works, you may be familiar with the term "entrapment."  And it's important to keep in mind that you don't see that anywhere in these instructions.  And so you are only to consider the law that the Judge has given you here today and nothing outside of that.

The elements of the offense.  The Judge has outlined them for you, and they are set forth on page 8.  I basically put them up there as well -- first, second, third, and fourth -- that on March 27, 2014, everything happened that day, right?  The texting.  The ad was posted.  The texting began around 9:00.  The Defendant was arrested by about 11:30.  It was a very quick evening, but it all happened on that day.

The allegation is that on that day here that the Defendant knowingly attempted to persuade, induce, or entice.  We're going to go through a lot of those facts in a

6

moment.

The second element is that he used his cell phone or the Internet.  Mr. Rogers, I think, stood up here yesterday and said that's not really contested.  Obviously, a cell phone and the Internet were used.

And that the Defendant believed that such individual was under the age of 18.  That's a contested issue.  We'll talk about that.

And that the sexual -- had the sexual activity occurred, the Defendant could be charged with a criminal offense.

Now, you have seen the instructions, I think, on the next page, which would be page 9, that Texas Penal Code 43.25 makes it illegal for someone over the age of 18 to have sex with someone under the age of 18 as outlined here. And that includes both actual sexual intercourse as well as simulated and other forms in that way.

So those are the first, second, third, fourth elements.

And, again, I don't think the Internet or cell phone is going to be a big issue.

And keep in mind that the Defendant essentially admitted -- not essentially.  The Defendant admitted every element of the offense in that video interview, which is in Government's Exhibit 6, which you will have an -- we played

the whole thing for you yesterday.  You will have an opportunity to play that back in the jury room.  If you so choose, play it again.  I'm going to play portions of it here today.  For time purposes I'm just clipping part of it, but you have the whole Exhibit 6 for you back there.

And keep in mind that he admitted that he got on Craigslist, admitted that he used his cell phone, admitted that he said all those things in the text messages, admitted that he knew Ashley was 14, almost 15.  I mean, he was verbatim reciting the text messages, right?  There was no mistake about that.

And then at the end of it you will recall -- and we'll play this again -- that he admitted that he intended to have sex with this child.

Exhibit 5 is the recorded call that you heard that happened during that two-hour window when he thought he was chatting with Ashley, the 14-year-old.  And he said lots of sexual things there that we will talk about as well.

And, of course, he showed up, in fact, to meet her.  This was not just idle banter, ladies and gentlemen.  This was not just a little chitchat on the Internet that could be arguably construed as no harm, no foul.  He showed up in a charter bus at a truck stop to meet what he thought was a 14-year-old girl.

You heard Mr. Rogers yesterday say you're going to

8

hear a lot of evidence that's creepy, but is it a crime. And I submit to you, ladies and gentlemen, that they are not mutually exclusive, that it is not one or the other. It can be both. And, in fact, of course, that's what we allege it is. It is both creepy and a crime. And your job is, of course, to assess the elements. But don't be disillusioned by the notion that, well, this is creepy but maybe it's not a crime. They're not one or the other, okay? They can be the same.

And you will be disturbed by the messages. Mr. Rogers and I agree on at least that much. And I think you see why.

Attempt. Now, keep in mind that this is charged as an attempt. There was no 14-year-old, right? So we're not saying that he actually persuaded a real 14-year-old. The law in this case says -- we're charging him with an attempt. An attempt has a slightly different twist to it.

Judge Junell explained to you that it's an attempt to persuade, induce, or entice, okay? It is not an attempt to have sex with the child. This is an important distinction that I want you to keep in mind. But when you read the instructions, you'll see in there that that's what this is about. It's about an attempt to persuade, not an attempt to have sex.

Now, you will see that the two seem very close

9

together, and it's understandable why, but keep in mind that it's did he attempt to persuade.

And what does attempt mean?  Attempt, as the Judge instructs you in there, involves some substantial step towards attempting -- towards persuading, inducing, or enticing.  It is not -- it's a substantial step towards persuasion.  It is not a substantial step towards the sex act.

Of course, you will see that he did go to some pretty good lengths to actually engage in sexual activity with this child in terms of getting in his giant charter bus and driving across town at a truck stop to meet this girl.  Again, not just idle banter.  Far more than that.

So what evidence is there of a substantial step towards persuasion, inducement, or enticement?  He said a variety of things that you may recall.

Judge, may I turn this monitor around to me?  It might help me a little bit.

(Pause)

MR. BERRY:  He said things -- remember, this is when he's talking to a 14-year-old.  He's received a picture, and he thinks he's received a picture of a 14-year-old girl.  And he says, "You look very pretty."  Okay.  Mild.  Not the end of the world.  But let's add to it.  "I like your smile."  "Please do."  And what he meant

at that moment in the conversation was, "Call your friend. Have her come bring me."

These are language that he's using, trying to get a 14-year-old to like him, to come meet with him, to come see him. And, of course, as we see later, what the intent of that is, is not to go see a movie but to engage in sexual activity.

And then, "How do I know you're real and not one of those stings that the cops put on?" That's pretty decent evidence, I believe, that he's attempting to persuade her, to verify that she is who she says she is. And who she says she is, is a 14-year-old girl who's willing with him.

"I just don't want to get arrested." The same type of language. That came from the phone call later.

And then when she and he are talking about when to meet, he says, "I want you to meet -- I'm ready to meet. Let's meet ASAP," was the word he was using, as soon as possible. He is eager. He is ready to go, trying to get her to go as well.

And then, "If I gave your friend ten." Again, further inducement, right? I mean, it doesn't get any clearer than that. "I will give your friend $10.00 if she will bring you to meet me." Inducement. Substantial step towards persuading, inducing, and enticing what he thought was a child.

Then there are the very, very crude things, some more crude than others. "Show you how to make a man happy. I want a girl who's going to do what she's told." These are all from the phone call. "I want you to wear a skirt and a thong. No, wait. No panties. None in fact. Call me daddy. That's hot. Let's come back to the motel and strip down and see what happens." These are all words that came out of the Defendant's mouth. The Defendant said these things, ladies and gentlemen.

And, remember, he admitted on cross-examination that this is the same kind of thing he says to his girlfriend, to the person he's allowed to say these things to. He is talking the exact same way to who he believes is a 14-year-old child as he does to his sexual partner, his girlfriend.

And something to keep in mind at this point as well is that the Defendant has absolutely no obligation to testify, right? You remember the Judge saying that to you yesterday? But when he does, on page 2, you will see in your instructions it talks about the Defendant's testimony. The very bottom of page 2, it says, "I remind you that a defendant has a right not to testify, but when a defendant does testify, his testimony should be weighed and his credibility evaluated in the same way as that of any other witness."

12

And then you can flip over to page 4 where it talks to you -- at the bottom of page 4 where it talks about credibility of witnesses. And it spills over on to page 5. And you can read that as well. But it talks about how to evaluate that testimony.

And so what's important to keep in mind here is while he has no obligation to take the stand, once he does take the stand, you don't have to give him some additional benefit. Once he takes the stand, he has decided to put himself under oath and to answer questions honestly and truthfully, and you have an opportunity and a right to judge that credibility and determine whether he is being truthful to you.

And one of the things, as the Judge instructs you on determining credibility, is that you don't have to believe everything is true and accurate. Of course, we will argue some of that in a moment. But you -- it asks you -- he suggests that you ask yourself a few questions. Did the person impress you as honest? Did he have any particular reason not to tell the truth?

Obviously, ladies and gentlemen, this defendant said one thing on the night of his arrest when he was caught, boom, red-handed, attempting to meet a 14-year-old; and now some months later, once he realizes he's in real hot water, he has now come up with an entirely different story.

And you have a right to judge that and determine whether he is creating this new theory, this new defense because he has a personal interest, he has a motivation to not tell the truth.  And that's important as well.

Now, what evidence is there that he knew her age?  Okay.  Well, first of all, he asked, "How old are you?"

And we told him.  "14.  U?"

How do we know he read that?  Because he responded to the "U" by saying "30," his real age.

Then just to make clear -- the agent wanted to make absolutely clear that he was not talking to someone who was not interested in a sexual interest of a child.  He wants -- we were only after people with sexual interest in children.  Again, right after that, follows up with, "I'm about to be 15."  The same thing as 14.  "How old are you again?"

And, again, the Defendant responds.  So he read that line as well.  He knows she's 14.  He knows.  We've told him that.  There is no indication to the contrary.

"How do I know that you're real and not one of those strings that the cops put on?"  That's not him saying, "You are under 18, and I know this is illegal," but it's pretty close to that, isn't it?  I mean, it doesn't get much closer.  He is acknowledging that this is illegal.  What he is doing is wrong and illegal because she is underage, and

14

he knows it, and that's why he's asking that question, not because he thinks that she is of age, pretending, playing some game.

He says, "I just don't want to get arrested" in the phone call that he has with the DPS trooper posing as the 14-year-old.

(Clip played)

MR. BERRY:  "I just don't want to get arrested." The same thing as he said in the text messages, which is, "I know this is wrong.  I know this is illegal.  I'm trying not to get in trouble."

What else -- what other evidence do we have that she -- he knew she was underage?  He admitted it that night after Agent Knight questioned him.  You saw -- Agent Knight didn't browbeat him.  Agent Knight didn't pressure him in any way.  He was very polite, very respectful to Mr. Cawthon.  And this is what Mr. Cawthon said.

(Clip played)

MR. BERRY:  He admits it.  "She said she was 14, almost 15," exactly what she, in fact, said.  He didn't say, "I thought she was really of age, pretending."  Never said any of that.  That's all new.  That's all fabricated now, the day of trial.

What about a substantial step towards a sex act?

Now, remember, I told you you don't have to find

15

the substantial step towards the sex act.  I think this evidence is helpful in understanding the substantial step towards the persuasion, inducement or enticement, because there is this additional evidence that it wasn't just talk; it wasn't just idle banter.  This additional evidence helps along those lines.  But, again, you don't have to find this far.  But this, what I'm showing you, is that there is that much evidence.

He drove himself to the meet location.  That's a substantial step.  The fact that he drove a charter bus.  I mean, it was a cumbersome vehicle to get to this meet location.  And he was motivated, ladies and gentlemen.  He didn't take a taxi.  He drove a giant charter bus to meet this 14-year-old child.

He was insistent.  "I want to meet now, ASAP." Substantial step.

9:27 is when he learns her age, ladies and gentlemen.  And 11:30, he is in custody at the truck stop. Two hours.  Two hours from the time he learns her age, he was there, ready, willing, eager, $10.00 bill in hand, ready to go.  That's a substantial step.

And then there was that phone call that you heard him masturbating on the phone call with what he thought was this 14-year-old girl, Ashley.

And along those lines, on page 4, the Judge talks

to you about being able to make inferences.  And I will bring this up again in a little bit.  But just briefly on page 4 it tells you that you are permitted to draw reasonable inferences as you feel are justified.  You may make deductions based upon reason and common sense.  You can listen to the evidence and determine what that fact really is.

So Exhibit 5 is the recorded call.  And I will play you a series of clips from that recorded call.  And this is -- here we're talking about his intent to engage in sexual activity.  Was his intent to meet a 14-year-old to go to the movies?  The answer is no.  And the evidence of that is largely found in Exhibit 5.  And this is one of the things he said.

(Clip played)

MR. BERRY:  "I can show you how to make a man happy."  Intent to engage in sexual activity.

Next one.

(Clip played)

MR. BERRY:  And, again, listen to all the heavy breathing in between, ladies and gentlemen.  It wasn't -- and if you listen to that call from the beginning, you don't hear it in the beginning.  It starts to pick up.  And you heard him yourself.  He wasn't on the treadmill.  He wasn't on the Stair Climber.

Exhibit 5, recorded call, wearing a skirt.

(Clip played)

MR. BERRY:  "I want you to wear a skirt.  That's a good start."  This is that talk he's giving.  He is trying to work into what she's going to wear when he meets her, because this is about sexual activity.

The next one.

(Clip played)

MR. BERRY:  "A thong.  No panties.  No, no, no.  No panties.  None."  He is making it really clear what his goal is here.

The next one, still in Exhibit 5.

THE COURT:  You have two minutes on your opening.

(Clip played)

MR. BERRY:  Again, "Call me daddy.  That's hot."  This is not fatherly love.  This is sexual intent.  Remember, this is a man with a 13-year-old child at home and here he is talking to what he thinks is a 14-year-old about calling him daddy in a sexual way.

The next one.

(Clip played)

MR. BERRY:  "Come back to the room and strip down and see where it goes from there."  It is not about playing Monopoly, ladies and gentlemen.  Intent to engage in sexual activity.

Here's from his interview, his video interview.

Go ahead.

(Clip played)

MR. BERRY:  "I decided to do something against the law."  An admission that he knew what he was doing was wrong, that it was with someone underage, and that he knew that it was about sexual activity.

Again, he admits to saying -- we don't have to play this one.  He admits in the interview, what you will have back there, where he says, "I told her to call me daddy.  I told her to wear a skirt, no panties."  We all just heard that.  He also admits in the interview that he was planning to have sex with this girl.

(Clip played)

MR. BERRY:  "Yes."  He's nodding along, nodding along with the agent.  "Yes, I was planning to have sex with this girl at the time."  None of this, "I thought she was over age.  This was just a game."  None of that.

Again, you have all of his statements there. These are his words, not the agent's words.  We ask you to find the Defendant guilty.

THE COURT:  Okay.  Mr. Rogers, you are recognized -- do you want the lights on?

MR. ROGERS:  Yes, Your Honor.

THE COURT:  Would you turn the lights on, please?

19

And if we could take that off the screen, Mr. Berry.  Thank you.

Okay.  Mr. Rogers, you're recognized to make a closing argument on behalf of Mr. Cawthon.

MR. ROGERS:  Thank you, Your Honor.  May it please the Court.

THE COURT:  Yes, sir.

MR. ROGERS:  Mr. Berry, Agent Knight, Mr. Klassen, Eric.

CLOSING STATEMENT

BY MR. ROGERS:

And I want to thank you.  I know it's been a quick trial, but nonetheless I want to thank you for your service because you have a difficult decision ahead of you.

There was a -- I can't remember when the movie was on, but last week or a few weeks ago I was watching a movie from 1984 called, "This is Spinal Tap."  I don't know if anyone has seen it or not.  There's a very famous scene in the movie where Rob Reiner is talking to Nigel, who is the lead guitarist for Spinal Tap.  It's about a fictional band from England.  But Nigel is showing him his guitar collection, and he has an amplifier.  And he says, "This is my favorite amplifier.

And he says, "Why is that?"

He goes, "When you need a little extra, it goes to

20

eleven."

And Rob Reiner says, "Really?  It goes to eleven?"

He goes, "Yes.  When you need that extra push, knock it up to eleven."

And Rob Reiner looks at him, and he says, "Well, why don't you just make ten the loudest?"

And Nigel looks at him and says, "It goes to eleven."

That's what the Government wants you to look at, is nothing else but an eleven.  This isn't an eleven. There's other factors.  You could hear that in what the case agent, Agent Knight, told you.  Unsolicited, sometimes solicited.  He kept telling you this man was coming here intending to show up and have sex with a 14-year-old girl. Well, there was no 14-year-old girl.  Eric has testified differently.

You saw a picture briefly flashed of a silhouette of a young girl.  But who is Ashley?  Ashley is sitting right here, Agent Knight, a white guy with a beard.  There's no young girl in this case.

When you look at the facts, I believe it's a reasonable-doubt case.  And you've got a lot of evidence to go back there and look at and talk about.

First of all, what happened in this case?  He answered an ad from Craigslist that you have to be 18 to put

on there.  I think, you know, the evidence was clear that he was looking to hook up.  He was on Casual Encounters under the personal ads in Craigslist, which basically means, "I'm looking for a one-night stand."

Look at the texts.  Look at who starts to initiate, "I'm bored.  I want to do something."  It's the Government.

Both sides dance around the issue, but both sides are pretending in this case.  I mean, they want to sit there and they want to say, "Oh, he believed this was a 14-year-old girl.  He knew."  But they were lying just as much.  I mean, there was no 14-year-old girl.

He told you, "I never thought this was a 14-year-old girl."

Does the picture look like she's 14?  Look at how she talked.  What 14-year-old thinks about, "Hey, I'm going to get on Craigslist, and I want to hook up with a 30-year-old fat guy"?

That's what -- those were his words.  "I never thought in my life that this girl would be interested in me. I thought this was like I had done in the past; it was sex talk and I might show up and it might be a hooker."

Look at the texts, because there is no sex in the texts.  Nothing.  They talk about showing up and meeting. That's it.

You get to hear the phone conversation. You know, it was awkward. Whether he was masturbating, not masturbating, not relevant. The Government brings that up to put some slime on Mr. Cawthon. Certainly, if they believe that to be true, ask him when he's on the stand under oath. Don't hide behind and insinuate things that just aren't fact.

What's the worst thing he said in there? "Let's strip down." That's it. No talk of sex or anything else.

We next move to the meeting. He drives his bus to a Pilot. If he really intended on inducing a minor or talking to a minor or talking to anyone having sex, don't you think he would have said, "Hey, can you get a ride to my hotel? I mean, here's where I am." How stupid is it to take your bus and drive it to a public place? That's ludicrous. A Greyhound bus, nonetheless.

What he also told you and he told the Government is, "Look, I changed my mind, regardless. I wasn't sure what I was walking into, but when I was driving over there, I changed my mind. There was no intent to do anything at that point."

And what happened? He showed up. Yeah, he had the $10.00 and said, "Whoever showed up I was going to give $10.00 because they drove out there for nothing." And he shows up and walks out of his bus, and he's taken down by a

tactical team.  And that's what Agent Knight told you.

The arresting officer is in tactical vest, took him down for some texts and a phone conversation.

He said, "I didn't know what I had done.  I didn't think I did anything," until they get him down to the station.  You didn't hear -- you get to hear a portion of the tape where they Mirandize him.

And listen to what the agent says, and listen to what he said on the stand.  "I told them what I wanted -- they wanted to hear, because I thought they were going to let me go."

Listen to what the agent said.  "No, he wasn't a bully.  He was nice and polite."  But he killed him with kindness.  And that knife goes just as deep, because he said, "Hey, buddy, you're not who we're looking for.  You're not one of these guys out looking to kidnap kids or transport them across the border.  You're not looking to rape kids.  You're not what we're looking for."  He gets him to talk, and then he arrests him.

And what Eric told you is, "I told them what they wanted to hear, because I thought that they were going to let me go."

He told him on the tape as well, you know, "Look, I changed my mind.  I wasn't going to do anything."  But they don't want you to believe him.  They don't want you to

24

believe any -- or give any creditability to what he said, but they want to give all the credibility to what the agent said.  And this was a whole made-up -- whole made-up case.

Let's talk about Eric.  What did he tell you?  He told you a little bit about his life.  He grew up, was in the Marine Corps for six years, got out and started doing long-distance trucking.

He said, "Trucking is a lonely business.  A lot of times we engage in phone sex close to truck stops.  You know, we talk on the CB to other people who turned out to be hookers.  That's what I thought this was.  When I talked about being arrested or being afraid of being arrested," he said, "I thought this was a hooker sting or something like -- something like that."

You know -- and, again, you know, what -- what did the Government really get?  I mean, what was really going on with Mr. Cawthon?  It sounded to me like from the texts and from the phone conversations that what they really ended up with was a lonely, horny guy looking to score that night, not some child predator looking to have sex with a 14-year-old.

He was engaged in a fantasy conversation.  That's what he told you.  That's what happens.  I told you at the outset that there were disturbing texts, disturbing phone calls.  Yes, there were.  Yes, they are.  I don't run away

with that -- or from that.  I can't run away from the texts. I can't run away from the phone conversation.  I can only try to put them in context and explain them.

A man took the stand and testified before you, never been in trouble before.  If there was pornography on his phone or child pornography on his phone, don't you think you would have heard about that?  You didn't hear about any evidence of anything other than texts and a phone conversation.  He had nothing else showing he had some kind of weird interest in children.  That lends credibility to what he told you.  This was a fantasy.

Again, what you have to go back and recognize is this is a reasonable doubt case.  The Government has to prove the case beyond a reasonable doubt.  You have to go back and ask yourselves, did they do it.  I would ask you to go back, look at the texts.  Are there any sexual connotations in the texts?  Any kind of inducement in the texts?  Listen to the phone conversation.  Watch his recorded videos.

And, again, they weren't abusive with him, but they got what they wanted because they almost made it sound like, "You're going to get out of here with a slap on the hand," and that wasn't the case.  And when he realized that wasn't the case, it was too late.

They didn't ask him or give him the chance to go

26

back and watch the tape, "Hey, what was really going on?" Didn't give him a chance to explain.

Like he told you, "I was in the Marine Corps. I went into my boot camp mode and answered 'yes, sir,' 'no, sir', 'yes, drill sergeant,' 'no, drill sergeant.'" No excuses, because he couldn't run away from the texts. They were what they were. They had the phone conversations.

But, again, go back, look at the elements of this crime and look at all the facts you saw and give him some credibility. They don't want to give him any credibility. But look at what the agents did, slipping in time after time, "This guy showed up to have sex with a 14-year-old," solicited and unsolicited.

These guys have an agenda. They want to get convictions. But, again, my position, Mr. Cawthon's position, is this is a reasonable doubt case and calls for a verdict of not guilty. And I ask you to go back and return a not-guilty verdict.

Thank you.

THE COURT: Mr. Berry.

MR. BERRY: Thank you, Your Honor.

CLOSING STATEMENT

BY MR. BERRY:

Ladies and gentlemen, let's just address this real quick. The Defendant was, in fact, in the Marines. You

heard the Defendant testify to that, and Mr. Rogers brought it up twice in closing argument.

You may recall during voir dire yesterday the Judge instructed you or asked a question of the panel, could you be fair without resort to sympathy or pity. Why do we keep talking about the fact that he's in the Marines?

It reminds me of an old friend of my dad's that lives south of town and he fixes tractors. And he had a funny saying for just about everything. And in a situation like this, he would say, "One aw-shucks wipes out a whole bunch of attaboys," which is a very West Texas way of saying just because you were in the Marines for four years and honorably discharged doesn't mean that you get to go try to have sex with a 14-year-old and get a jail -- get-out-of-jail-free card, okay? So put that aside. That is not something that's relevant to this case.

Now, he says he wanted to -- or he says that there was no real girl, that this is Ashley. And he wants you to be unafraid by the fact that the Defendant was talking to Agent Knight.

If you look on page 8 of your instructions, you will see in the second-to-last paragraph, just before the elements -- or just after the elements, it says, "It is not necessary for the Government to prove the individual was in fact less than 18 years of age; but it is necessary for the

28

Government to prove the Defendant believed such."

In other words, it doesn't matter that it was an agent. And, of course, he was an agent. Of course, it was not a real child. We are not hiding that fact. This is an attempt, ladies and gentlemen. And the Judge has instructed you on that.

Now, the Defendant also testified, and you heard Mr. Rogers sort of meld the two, about this was a game, as the Defendant said, or Mr. Rogers referred to it as a fantasy conversation; that the Defendant never really believed that she was under the age of 18.

You see no evidence -- no evidence, zero evidence in the record anywhere here that this defendant thought anything other than the fact that she was 14, almost 15. Never says it to the agents, never says it to her, never indicates one way or another, never takes the chance to get away from it, completely plows straightforward and said, "I hope I don't get arrested."

THE COURT: You have two minutes.

MR. BERRY: Thank you, Judge.

He knew that this was real.

But let's talk about this game, this fantasy. Remember, he testified that he's done this seven times before. And this time -- one time he said, I think, he actually said she showed up when he was talking to someone

29

who said they were underage.  It turned out to be an adult. And this time he thought he had hit the jackpot.  I mean, he was ecstatic.  You could hear him on the phone call, ladies and gentlemen.  He was thrilled.  He thought he got a real 14-year-old on the phone, that she was going to meet him at this truck stop.  Yeah, it was a game, a game in the sense that he thought he had hit the jackpot and got a 14-year-old girl.

And on this fantasy side of it, fantasy game, whatever you want to call it, he could engage in all kinds of fantasies on the Internet.  He could pretend to be anybody he wants on the Internet.  He could pretend to be a doctor, he could pretend to be a sports star, anybody he wants; and, instead, on March 27, 2014, he didn't just pretend, but he pretended to be a pedophile.

If that's what he wants to say is his fantasy, ladies and gentlemen, this was his fantasy that he was trying to act out in the real world with someone he thought was a 14-year-old girl.

Please find him guilty.

(End of Closing Statements)

30

I, TODD ANDERSON, United States Court Reporter for the United States District Court in and for the Northern District of Texas, Dallas Division, hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above entitled and numbered cause.

WITNESS MY HAND on this 23rd day of January, 2015.


/s/Todd Anderson
TODD ANDERSON, RMR, CRR
United States Court Reporter
1100 Commerce St., Rm. 1625
Dallas, Texas  75242
(214) 753-2170